T.C. Memo. 2017-150

UNITED STATES TAX COURT

CURTIS INVESTMENT COMPANY, LLC, HENRY J. BIRD, A PARTNER
OTHER THAN THE TAX MATTERS PARTNER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

GUY R. BAXTER AND LONNIE C. BAXTER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 10181-08, 16835-08.          Filed August 2, 2017.

<u>David D. Aughtry</u> and <u>Hale E. Sheppard</u>, for petitioners.

<u>Jason P. Oppenheim</u>, <u>John W. Sheffield, III</u>, and <u>Lawrence Sledz</u>, for

respondent.

[*2]     MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, Chief Judge: These cases have been consolidated for trial, briefing, and opinion. The issues for decision are whether petitioners are:[1]

(1) entitled to deduct the losses and fees associated with Custom Adjustable Rate Debt Structure (CARDS) transactions for taxable year 2000 (year at issue) and

(2) liable for accuracy-related penalties under section 6662(a).[2]

Respondent issued a notice of final partnership administrative adjustment (FPAA) pursuant to section 6223 to R. Alan Bird, Jr., the tax matters partner (TMP) of Curtis Investment Co., LLC (Curtis Investment), a limited liability company (LLC) organized under the laws of the State of Georgia. In the FPAA respondent disallowed Curtis Investment's claimed loss deduction for 2000 that resulted from a CARDS transaction and the claimed deductions from entering into the transaction. Respondent also determined accuracy-related penalties under

---

[1]We use the term "petitioners" to refer collectively to Curtis Investment and Mr. and Mrs. Baxter.

[2]All section references are to the Internal Revenue Code (Code) in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

[*3] section 6662(a) for a gross valuation misstatement.[3] Because R. Alan Bird, Jr., did not petition this Court within 90 days, Henry J. Bird, a notice partner, filed a petition pursuant to section 6226(b).

Respondent issued a notice of deficiency to Mr. and Mrs. Baxter on April 8, 2008, that determined a deficiency and accuracy-related penalty under section 6662(a) for a gross valuation misstatement in Mr. and Mrs. Baxter's Federal income tax for 2000.[4] In the notice of deficiency respondent disallowed a claimed loss deduction for 2000 as a result of a CARDS transaction similar to Curtis Investment's CARDS transaction.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of fact and facts drawn from stipulated exhibits are incorporated herein by this reference. Mr. and Mrs. Baxter resided in South Carolina at the time of filing their

---

[3]Alternatively, respondent determined that petitioners are liable for accuracy-related penalties under sec. 6662(a) for negligence or a substantial understatement of income tax.

[4]Respondent also issued a notice of deficiency to Mr. and Mrs. Baxter for 2001 that determined a deficiency in Federal income tax and an accuracy-related penalty under sec. 6662(a). Respondent's position with respect to 2001 is an alternative to respondent's determination for 2000. Because we hold that Mr. and Mrs. Baxter's CARDS transaction lacked economic substance, respondent concedes the 2001 deficiency and accuracy-related penalty.

[*4] petition. Curtis Investment's principal place of business when its petition was filed was Georgia.

I.    Petitioners

In 1882 Henry Russell Curtis founded Curtis Printing Co., which became a very successful printing company. In 1918 Curtis Printing Co.'s name was changed to Curtis 1000, and in 1968 Curtis 1000 decided to offer its stock to the public. In order to offer the stock of Curtis 1000 to the public, Curtis 1000 incorporated American Business Products, Inc. (ABP). ABP became the corporate parent of Curtis 1000, and the ABP stock was traded to the public.

Before the public offering, Curtis 1000 was primarily owned by the Curtis family. In 1961 the family formed Curtis Investment, which operated as a holding company for Curtis 1000 stock. After the public offering, Curtis Investment owned approximately 30% of the ABP stock.[5] In addition to holding ABP stock, Curtis Investment began diversifying its portfolio. As part of its diversified portfolio, Curtis Investment would borrow funds at a low interest rate to make an investment if it determined that the investment would yield a return greater than the interest cost.

---

[5]Members of the Curtis family, including Mrs. Baxter, also individually owned ABP stock.

[*5]   In 1986 Mrs. Baxter became the managing member of Curtis Investment.[6]
In 1997 her son, Henry J. Bird (Mr. Bird),[7] started to work at Curtis Investment
after previously working at Curtis 1000 for over 15 years.  On January 1, 1998,
Mr. Bird became the managing member of Curtis Investment.  Mr. Bird holds a
bachelor's degree in business administration from West Georgia College.  He was
also the president of a mortgage company, Birdhouse Mortgages, and as a result he
is familiar with loan origination fees and the lending industry.

When Mr. Bird became the managing member of Curtis Investment, the
company included 34 family members.  To centralize management in 1998 Mr.
Bird formed an investment committee to assist Curtis Investment with determining
what type of assets the company should hold.  The investment committee
determined that Curtis Investment should diversify its holdings, and therefore as
part of that diversification Curtis Investment would sell some of its ABP stock
over a 10-year period.

---

[6]Mrs. Baxter started working for Curtis Investment in 1978.  Mrs. Baxter is
the great-granddaughter of Henry Russell Curtis, the founder of Curtis Printing
Co.  The record states that Mrs. Baxter and later her son, Mr. Bird, were the
managing partners of Curtis Investment.  Because Curtis Investment was
organized as an LLC, we will refer to them as managing members.

[7]Mr. Bird is often referred to as Jay Bird throughout the record.

**[\*6]** In either late 1999 or early 2000, however, ABP received a tender offer for the purchase of the company. ABP's board accepted the tender offer, and as a result of the tender offer, Curtis Investment sold 1,430,499 shares of ABP stock and 33,800 shares of ABP stock on February 23 and 28, 2000, respectively. These sales generated a $28,597,759 long-term capital gain. Mrs. Baxter sold 133,190 shares of ABP stock on February 28, 2000, and that sale generated a $2,444,383 long-term capital gain and a $18,895 short-term capital gain. Petitioners were therefore no longer able to sell their ABP stock over a 10-year period.

Petitioners knew that the sales of ABP stock would generate substantial tax liabilities, and they began considering ways to shelter the capital gains triggered by the sales. Petitioners considered several different tax shelter transactions but ultimately rejected those proposals. Then in the fall of 2000 they began considering CARDS transactions to minimize their tax liabilities.

II.     Petitioners' Entry Into the CARDS Transactions

CARDS transactions are not new to this Court. See generally Hunter v. Commissioner, T.C. Memo. 2014-132; Crispin v. Commissioner, T.C. Memo. 2012-70, aff'd, 708 F.3d 507 (3d Cir. 2013); Kerman v. Commissioner, T.C. Memo. 2011-54, aff'd, 713 F.3d 849 (6th Cir. 2013); Country Pine Fin., LLC v. Commissioner, T.C. Memo. 2009-251. The CARDS transaction, including the

[*7] CARDS transactions at issue here, was developed and marketed by Chenery Associates, Inc. (Chenery). Roy Hahn is Chenery's founder and worked with petitioners on their CARDS transactions. The purpose of a CARDS transaction is to create an artificial substantial capital loss that offsets an unrelated capital gain.

In the fall of 2000 Barbara Coats, an accountant at Windham Brannon, P.C. (Windham Brannon), and an adviser of petitioners, learned about the alleged benefits of CARDS transactions while teaching a class. Ms. Coats was introduced to Mr. Hahn, who recommended CARDS transactions to shelter petitioners' capital gains that resulted from the ABP stock sale and as a way to obtain long-term funds for investment. Ms. Coats believed the proposal could work for petitioners because of their history with leveraging debt and their desire to shield the gains from the sale of ABP stock.

Ms. Coats and another accountant of Windham Brannon, Matt Levin, presented the CARDS transactions proposal to Mr. Bird. Mr. Bird asked petitioners' advisers to research the proposal. Petitioners' advisers included Ms. Coats and Mr. Levin of Windham Brannon; and Thomas H. Rogers III and Ann A. Watkins, lawyers at Rogers & Watkins.[8] Mr. Rogers was to review the contracts

---

[8]Petitioners had previously retained Stalled Hie as their lawyer. However, Mr. Hie was no longer their legal counsel by the year at issue. Petitioners also

(continued...)

[*8] and the tax consequences of the CARDS transactions. Windham Brannon also reviewed tax consequences of the CARDS transactions.

During their review of the contracts and tax consequences of the CARDS transactions, petitioners' advisers received a model legal opinion for a CARDS transaction drafted by the law firm of Brown & Wood. The model opinion letter included several blanks and explanatory brackets where currency amounts, dates, and names were to be entered. Although the model opinion letter did not address petitioners' specific CARDS transactions,[9] the model opinion letter did generally describe a CARDS transaction. The model opinion letter concluded that a CARDS transaction would "more likely than not" have economic substance.[10] In

---

[8](...continued)
relied on investment advice from Eric Zimmerman.

[9]For example, petitioners borrowed from HVB Structured Finance, Inc., a subsidiary of Bayerische Hypo-Und Vereinsbank, AG (collectively referred to as HVB) and not Deutsche Bank. The letter also assumed that petitioners were borrowing the present value of the amount assumed due in 30 years. Petitioners received only a portion of the amount due in 30 years.

[10]In 2000 respondent issued Notice 2000-44, 2000-2 C.B. 255, warning taxpayers of CARDS transactions and Son-of-BOSS transactions. The model opinion letter from Brown & Wood discusses the notice. Mr. Bird testified that he reviewed the model opinion letter with Mr. Rogers extensively. We therefore conclude that Mr. Bird was aware of respondent's position.

[*9] reviewing the model opinion letter, petitioners spoke with R. J. Ruble, an attorney at Brown & Wood.[11]

Ms. Coats, Mr. Levin, and Mr. Rogers reviewed the model opinion letter and relied solely on the model opinion letter and materials cited therein to form their opinion of the CARDS transactions. None of petitioners' advisers provided their own opinion letters. Mr. Bird knew that petitioners' advisers relied solely on the model opinion letter and the materials cited within the model opinion letter. After reviewing the model opinion letter, petitioners' advisers concurred with the model opinion letter regarding the tax consequences and did not raise any additional issues.[12]

Chenery provided petitioners with their respective opinion letters from Brown & Wood that discussed their particular CARDS transactions after petitioners had already entered into their CARDS transactions. As part of

---

[11]Mr. Hahn listed Mr. Ruble as a reference for petitioners to contact regarding Mr. Hahn's qualifications.

[12]Ms. Coats testified that she believed that while the capital loss would offset the capital gain from the ABP stock, she believed that petitioners would ultimately pay tax on the gain over time. In other words, the tax would be deferred. Petitioners also testified to this effect. However, we do not find their testimony credible. The record is devoid of any documentary evidence to suggest that petitioners would pay the tax over time, and the model opinion from Brown & Wood does not include this conclusion.

**[*10]** petitioners' CARDS transactions, Chenery had promised the opinion letters. Chenery told petitioners that the opinion letter would eliminate the risk of tax penalties. Petitioners did not pay Brown & Wood directly for the opinion letters; Chenery paid Brown & Wood from fees petitioners paid to Chenery.

In addition to arranging for a review of the model opinion letter, petitioners hired a private investigator to investigate Chenery and Mr. Hahn. Petitioners' advisers did research on HVB, the bank providing the loans for the CARDS transactions, and on Brown & Wood, and that research did not generate any concerns.

As described infra pp. 16-18, petitioners, as part of the CARDS transactions, would receive some proceeds that they planned to invest. Mr. Bird assumed the primary responsibility for researching the investment potential of the CARDS transactions and deciding whether petitioners could profit from them. Mr. Bird's research led him to conclude that petitioners needed to earn 7.9% to make the CARDS transactions profitable. Mr. Bird calculated that the expected rate of return on investments made with proceeds from the CARDS transactions was 17.2% and that after factoring in costs of 7.9%, petitioners could expect a net return of 9.3% (17.2%–7.9%). Petitioners' advisers reviewed Mr. Bird's calculations and confirmed that the CARDS transactions could be profitable.

[*11]  On December 16, 2000, Curtis Investment's investment committee discussed the CARDS transactions.  During the meeting Mr. Bird made a PowerPoint presentation regarding the CARDS transactions.  The presentation included Mr. Bird's analysis of the investment potential, which he referred to as a "capital leverage" plan.[13]  Although the PowerPoint presentation did not include any information regarding the tax benefits of the proposal, tax benefits were discussed.[14]

Petitioners ultimately decided to participate in the CARDS transactions. Petitioners did not consider any financing options other than the CARDS transactions in the last quarter of 2000.

---

[13]The presentation included several errors about the actual CARDS transactions at issue.  For example, the calculations include only 29 years of accruing interest for a 30-year loan.

[14]Mr. Bird testified that he did not know whether he would have approved the CARDS transactions absent the tax benefits.  Mrs. Baxter testified that she would not have engaged in a CARDS transaction if the tax could have been completely avoided.  Another member of the investment committee, Hal Curtis, testified that the tax benefits were irrelevant to him in his decision that Curtis Investment should engage in the CARDS transaction.  For the reasons discussed infra pp. 32-34, we do not find petitioners' testimony credible.

[*12] III.    The CARDS Transactions

A CARDS transaction typically has three stages: (1) loan origination; (2) loan assumption; and (3) loan operation.  The CARDS transactions at issue in these cases also had three stages, which are described below.

A.    Origination

On December 11, 2000, Elizabeth A.D. Sylvester and Michael Sherry,[15] residents of the United Kingdom, organized Brondesbury Financial Trading, LLC (Brondesbury), as a Delaware LLC for the sole purpose of facilitating the CARDS transaction with respect to Curtis Investment.  Also on December 11, 2000, Ms. Sylvester and Mr. Sherry organized Caledonian Financial Trading, LLC (Caledonian), as a Delaware LLC for the sole purpose of facilitating a CARDS transaction with respect to Mr. and Mrs. Baxter.  Ms. Sylvester and Mr. Sherry capitalized the entities solely through the use of promissory notes.

On December 14, 2000, Brondesbury and Caledonian each entered into a credit agreement with HVB, a German-based bank, whereby HVB agreed to lend

---

[15]Ms. Sylvester and Mr. Sherry are not strangers to this Court.  Each has participated in other CARDS transactions that have come before us, for example, in Country Pine Fin., LLC v. Commissioner, T.C. Memo. 2009-251, where they established another Delaware LLC that acted as the borrower in that matter. Petitioners did not hire a private investigator to investigate Ms. Sylvester and Mr. Sherry but did review Ms. Sylvester's résumé.

[*13] Brondesbury €35.3 million and Caledonian €2.9 million. Both credit agreements were for a 30-year period. Other than the names of the borrowers and the amounts borrowed, the two credit agreements were substantially identical.

Although the credit agreements included a 30-year period, HVB had the unilateral right to call the loan at the end of every year. Interest on the loans accrued annually with the exception of the first and second interest periods, which occurred in the first year of the loan.[16] HVB could adjust the interest rate annually.

The agreement governing the loans required different collateralization according to the quality of the collateral. If the collateral consisted of cash, or an acceptable cash equivalent, the borrowers were required to deposit collateral equal to 102% of their obligations to HVB. If the collateral consisted of other assets, the borrowers were required to deposit collateral equal to 108% of the obligations.

HVB deposited 85% of each loan's proceeds into a time deposit account established at HVB for each borrower. The time deposits were set to mature in one year.[17] HVB disbursed the remaining 15% of each loan's proceeds by issuing

---

[16]The interest rate was equal to the 12-month euro LIBOR, plus a spread of 0.5%. Euro LIBOR on December 14, 2000, was 4.885%.

[17]Mr. Bird testified that he believed that the time deposits would be reset

(continued...)

[*14] a one-year promissory note to each borrower. Both the time deposits and the loan proceeds paid interest at a rate equal to 12-month LIBOR. There was a difference of 0.5% between the interest owed on the loan and the interest rate paid on the time deposits and promissory notes.

Brondesbury and Caledonian pledged their respective time deposits and promissory notes as collateral for the loans.[18] As a result of the time deposits and promissory note collateralization, the amounts of the loans were fully collateralized. The entities could not withdraw cash from HVB without substituting collateral, and any substitution of collateral required HVB's approval. HVB also had the right to withdraw interest due to HVB from the time deposit account when an interest payment was due.

B.    Loan Assumption

On December 27 and 28, 2000, Curtis Investment executed a series of agreements with Brondesbury, and Mrs. Baxter executed similar documents with Caledonian. Both purchased their respective counterparties' HVB promissory

---

[17](...continued)
each year. We do not find his testimony credible with respect to the time deposits because there is no documentary evidence that suggests a reset each year.

[18]Proceeds from the redemption of the promissory notes were also pledged as collateral.

[*15] notes that represented 15% of the counterparties' loan proceeds. In exchange for the promissory notes, they agreed to assume 100% of their respective entities' HVB loans on a joint and several basis. The amounts of the HVB loans and the amounts of the liabilities assumed by petitioners were calculated to shield most of the ABP stock gain from taxation.

The full balance of each entity's loan was due on December 14, 2030. However, petitioners were also aware that HVB could call the loan on or after December 14, 2001. Petitioners' attorney, Tom Rogers, had advised Mr. Bird regarding the calling of the loans. Mrs. Baxter was also aware that HVB could call the loans.

Both Brondesbury and Caledonian agreed to make annual interest payments to HVB, but petitioners were required to replace any collateral used to make those interest payments. Both Brondesbury and Caledonian agreed not to request the release or withdrawal of any of the collateral; and as long as the collateral remained (i.e., the time deposits), it would be used to pay off the principal of the loan. Consequently, petitioners did not gain access to the full amounts of the loans.

On December 28, 2000, petitioners redeemed their respective promissory notes. HVB deposited €5.295 million into Curtis Investment's HVB account and

[*16] €435,000 into Mrs. Baxter's HVB Account. On the same day, petitioners requested that HVB exchange the euro for U.S. dollars at a dollar-to-euro exchange rate of 0.924. Petitioners also entered into one-year forward contracts[19] with HVB. The forward contracts required petitioners to sell U.S. dollars for euro on December 14, 2001, using a 0.9402 dollar-to-euro exchange rate. As a result of petitioners' inflated bases from assuming liability for the full amounts of the loans, the dollar-to-euro exchange resulted in a $27,724,620 purported loss for Curtis Investment and $2,277,660 purported loss for Mr. and Mrs. Baxter.

### C. Operational Phase

Petitioners were subject to the same limitations as Brondesbury and Caledonian in terms of withdrawing the proceeds from the HVB loans. Petitioners could not withdraw the cash without HVB's approval. Petitioners purportedly found this unacceptable. Therefore, before entering into the CARDS transactions, petitioners had negotiated a solution with Canadian Imperial Bank of Commerce (CIBC) to facilitate the withdrawal of cash from HVB. Petitioners had a prior relationship with CIBC and held several investment accounts with the bank.

---

[19]A forward contract is a contract that allows two parties to buy or sell an asset at a specified time for a specified amount. In these cases the forward contract allowed petitioners to convert U.S. dollars back into euro. See Kipnis v. Commissioner, T.C. Memo. 2012-306, at *15 n.10.

[*17] To facilitate the withdrawal of cash, CIBC issued petitioners one letter of credit with a value of $6.7 million. HVB would allow the use of the letter of credit as substitute collateral. CIBC charged petitioners $241,200 for the letter of credit. The letter of credit had a stated termination date of December 27, 2001. If petitioners needed the letter of credit for subsequent years, they would have to pay CIBC $20,000 each year. The assets in petitioners' CIBC investment accounts were used to collateralize the letter of credit. To ensure that the letter of credit was fully collateralized, Curtis Investment was required to maintain at least $6.7 million in its investment accounts at CIBC.

Both Curtis Investment and Mrs. Baxter used the letter of credit as replacement collateral. On December 28, 2000, HVB deemed the letter of credit acceptable as substitute collateral and wired $5,294,520 to one of Curtis Investment's CIBC accounts. The funds consisted of $4,892,580 for Curtis Investment and $401,940 for Mrs. Baxter. Petitioners pledged to HVB a first priority lien and security interest in favor of HVB for the letter of credit. As a result of the letter of credit, petitioners' CARDS loans were fully collateralized.

On December 29, 2000, CIBC credited the $5,294,520 to a Curtis Investment account. Petitioners maintained the proceeds deposited with CIBC in

[*18] cash and did not make investments consistent with Mr. Bird's purported capital leverage plan until February 15, 2001.

D.  Fees

To set up and facilitate its CARDS transaction Curtis Investment paid $1,938,465 to Chenery.  Mrs. Baxter paid Chenery $154,375 to set up and facilitate her CARDS transaction.  Therefore, including the $241,200 that petitioners paid CIBC for the letter of credit, petitioners paid $2,334,040 in fees.  The upfront fees totaled approximately 45% of the cash petitioners received from HVB.

Mr. Bird was familiar with loans and the lending industry.  He was president of a mortgage company called Birdhouse Mortgages.  According to Mr. Bird, an origination fee is computed on the amount borrowed and not on the amount owed at the end of the loan.  Birdhouse Mortgages did not offer any products with a 44% or more loan origination fee.

IV.  Unwinding the CARDS Transactions

On November 13, 2001, petitioners received notice from HVB that HVB intended to call the loans.[20]  The time deposits in accounts with HVB for the

_____

[20]Petitioners testified that HVB told them as a result of the events on September 11, 2001, the bank was repositioning its investment focus and had

(continued...)

[*19] respective entities were used to repay most of the outstanding loans. As a result, Curtis Investment had to repay HVB $5,378,764.49, and Mrs. Baxter had to repay $441,881.50. On or around December 14, 2001, petitioners wired HVB funds to satisfy the remaining balance of the HVB loans.

Petitioners sought replacement financing from CIBC, Bank of North Georgia, Deutsche Bank, and National Bank of South Carolina for the full amounts of the two loans. However, petitioners ultimately did not obtain replacement financing for the entire loan amounts. Petitioners did negotiate a loan of $8.5 million from CIBC and used a portion of the proceeds to satisfy their obligations to HVB.

V.    Petitioners' Income Tax Returns and Notices of Deficiency

Curtis Investment timely filed its Form 1065, U.S. Return of Partnership Income, for the year at issue, reporting a $28,597,759 long-term capital gain from the ABP stock sale. Curtis Investment also reported a $27,724,620 loss as a result of the CARDS transaction. The loss from the CARDS transaction allegedly occurred when Curtis Investment redeemed the promissory note. Curtis

---

[20](...continued)
decided to call the loan. We do not find petitioners' testimony credible because other facts in the record suggest that the CARDS transaction would not last the entire 30-year term. See infra p. 33.

[*20] Investment redeemed $4,892,580 from the promissory note but claimed a basis of $32,617,200 as a result of its joint and several liability for the entire HVB loan of Brondesbury. Curtis Investment also claimed a deduction of $1,400 for loan origination fees.[21]

Respondent issued an FPAA to the TMP for Curtis Investment on December 6, 2007. In the FPAA respondent determined that Curtis Investment was not entitled to deductions for capital losses or transaction costs as a result of the CARDS transaction and that Curtis Investment was liable for accuracy-related penalties. Because the TMP did not petition this Court, Mr. Bird, a notice partner and managing member for the year at issue, filed a petition pursuant to section 6226(b).

Mr. and Mrs. Baxter timely filed their Form 1040, U.S. Individual Tax Return, for taxable year 2000. On their Form 1040, Mr. and Mrs. Baxter reported a long-term capital gain of $2,444,383 and a short-term capital gain of $18,895 from the sale of ABP stock that Mrs. Baxter owned individually. Mr. and Mrs. Baxter also reported a $2,277,660 capital loss as a result of the CARDS transaction. The loss from the CARDS transaction allegedly occurred when Mrs.

---

[21]The loan origination fees totaled $1,938,465, but Curtis Investment amortized the fees and claimed a deduction of $1,400.

**[\*21]** Baxter redeemed her HVB promissory note. Mrs. Baxter redeemed her promissory note with a value of $401,940 but claimed a basis of $2,679,600 as a result of her joint and several liability for the entire HVB loan of Caledonian.

Respondent issued notices of deficiency to Mr. and Mrs. Baxter on April 8, 2008, for taxable years 2000 and 2001. In the notice of deficiency for the 2000 taxable year, respondent determined, inter alia, that Mr. and Mrs. Baxter were not entitled to the capital loss deduction as a result of the CARDS transaction because the transaction lacked economic substance. Additionally, respondent determined that Mr. and Mrs. Baxter were liable for accuracy-related penalties.[22] Mr. and Mrs. Baxter timely petitioned this Court.

VI.   The Expert Reports

Respondent introduced an expert report by A. Lawrence Kolbe. Dr. Kolbe holds a Ph.D. in economics from the Massachusetts Institute of Technology and has previously testified in or been deposed in Tax Court cases involving CARDS transactions. See, e.g., Hunter v. Commissioner, T.C. Memo. 2014-132; Kipnis v. Commissioner, T.C. Memo. 2012-306; Crispin v. Commissioner, T.C. Memo. 2012-70; Gustashaw v. Commissioner, T.C. Memo. 2011-195, aff'd, 696 F.3d

---

[22]Respondent concedes the 2001 deficiency and penalty if the Court holds for respondent with respect to 2000.

**[\*22]** 1124 (11th Cir. 2012); <u>Kerman v. Commissioner</u>, T.C. Memo. 2011-54;

<u>Country Pine Fin., LLC v. Commissioner</u>, T.C. Memo. 2009-251. Dr. Kolbe's

report focused on the CARDS transactions as financing decisions and therefore

analyzed the loans and not what was done with the proceeds. Dr. Kolbe concluded

that the CARDS transactions were not economically rational because the expected

rate of return on the amount invested did not exceed or even equal the "cost of

capital", i.e., the expected rate of return in capital markets on alternative

investments of equivalent risk. On the basis of his analysis, Dr. Kolbe concluded

that the net present value of the loans was negative €2.19 million. A typical loan

has a net present value of zero. In other words, the loans would reduce

petitioners' wealth by €2.19 million regardless of the returns from the investments.

Dr. Kolbe also considered the fees and interest rate of the CARDS

transactions. On the basis of his analysis, Dr. Kolbe concluded that the fees were

$1,887,962 more than for a loan that would yield similar proceeds and that the

interest rate on the loans was 2.970% higher than market interest rates, without

fees. Dr. Kolbe also noted that the longer the loans were maintained, the worse off

petitioners were because of the excessive annual costs of the loans after the first

year. Dr. Kolbe therefore concluded that the loans were an unprofitable financing

[*23] decision and the use of the loan to purchase any investment would create an unnecessary and material drag on the investment's profitability.

Petitioners introduced the expert report of James A. Walker, a banker with 47 years of experience. Mr. Walker holds an M.B.A. degree from Georgia State University. Mr. Walker's report discusses commercial lending practices. He concludes that the credit agreement was a 30-year loan term. His report does not address the profit potential or the business purpose of the CARDS transactions.

Petitioners also introduced the expert report of Conrad S. Ciccotello. Dr. Ciccotello has a Ph.D. in finance from Pennsylvania State University and is a professor at Georgia State University. Dr. Ciccotello's report focuses on the investment potential of the CARDS transactions and concludes that petitioners could profit from the CARDS transactions if their investment returns are greater than 9.5%.

OPINION

I.    Burden of Proof

Tax deductions are a matter of legislative grace, and the taxpayer has the burden of proving that he is entitled to the deductions claimed. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). However, if a taxpayer produces credible

[*24] evidence[23] with respect to any factual issue relevant to ascertaining the taxpayer's liability for any tax imposed by subtitle A or B of the Code and satisfies the requirements of section 7491(a)(2), the burden of proof on any such issue shifts to the Commissioner. Sec. 7491(a)(1). Section 7491(a)(2) requires a taxpayer to demonstrate that he or she (1) complied with the requirements under the Code to substantiate any item, (2) maintained all records required under the Code, and (3) cooperated with reasonable requests by the Secretary[24] for witnesses, information, documents, meetings, and interviews. See Higbee v. Commissioner, 116 T.C. 438, 440-441 (2001).

Although petitioners contend that the burden of proof should shift to respondent, petitioners have failed to produce credible evidence to support a shift in the burden of proof. Therefore, the burden of proof remains with petitioners. Even if petitioners had produced credible evidence, which they did not, to support a shift in the burden of proof, the parties filed a joint statement of issues and did

_____

[23]"Credible evidence is the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness)." Higbee v. Commissioner, 116 T.C. 438, 442 (2001) (quoting H.R. Conf. Rept. No. 105-599, at 240-241 (1998), 1998-3 C.B. 747, 994-995).

[24]The term "Secretary" means the Secretary of the Treasury or his delegate. Sec. 7701(a)(11)(B).

**[*25]** not list the burden of proof as an issue. Accordingly, the burden of proof is not at issue.

II.     Merits of CARDS Under the Economic Substance Doctrine

Taxpayers have the right to structure their transactions in a manner which decreases the amount of what otherwise would be their taxes. Gregory v. Helvering, 293 U.S. 465, 469 (1935). However, even if a transaction is in formal compliance with the Code, the economic substance of the transaction determines what is and what is not income to a taxpayer. Generally courts use a two-prong test to decide whether a transaction has economic substance. We are mindful, however, that there is a split among the Courts of Appeals as to the proper application of the economic substance doctrine. Absent a stipulation to the contrary appeals in these cases lie with the Court of Appeals for the Eleventh Circuit with respect to Curtis Investment and the Court of Appeals for the Fourth Circuit with respect to Mr. and Mrs. Baxter. Accordingly, we follow the laws of those circuits. See Golsen v. Commissioner, 54 T.C. 742 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971)

In determining whether a transaction has economic substance the Court of Appeals for the Eleventh Circuit has stated that (1) a transaction ceases to merit tax respect when it has no economic effects other than the creation of tax benefits

[*26] (the objective test) and (2) even if the transaction has economic effects, it must be disregarded if it has no business purpose and its motive is tax avoidance (the subjective test). United Parcel Serv. of Am., Inc. v. Commissioner, 254 F.3d 1014, 1018 (11th Cir. 2001), rev'g T.C. Memo. 1999-268; Kipnis v. Commissioner, at *23-*24. The Court of Appeals for the Fourth Circuit has stated:

> To treat a transaction as a sham, the court must find [(1)] that the taxpayer was motivated by no business purpose other than obtaining tax benefits in entering the transaction, and [(2)] that the transaction has no economic substance because no reasonable possibility of a profit exists. * * *

Black & Decker Corp. v. United States, 436 F.3d 431, 441 (4th Cir. 2006); Hines v. United States, 912 F.2d 736, 739 (4th Cir. 1990); Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89, 91 (4th Cir. 1985), aff'g in part, rev'g in part, 81 T.C. 184 (1983). Thus the first prong of the test in the Fourth Circuit is subjective while the second is objective. Therefore, for a finding that Mr. and Mrs. Baxter's CARDS transaction lacked economic substance the transaction must satisfy both prongs of the test while Curtis Investment's CARDS transaction must satisfy only one prong of the test.

This Court has examined other CARDS transactions promoted by Chenery. We have held that the CARDS transaction lacked economic substance on each

[*27] occasion.  See Kipnis v. Commissioner, T.C. Memo. 2012-306; Crispin v. Commissioner, T.C. Memo. 2012-70; Kerman v. Commissioner, T.C. Memo. 2011-54; Country Pine Fin., LLC v. Commissioner, T.C. Memo. 2009-251.  The other CARDS transactions are essentially the same as the CARDS transactions in these cases with only immaterial differences.  Accordingly, we will look to the economic substance test as we have in past CARDS transaction cases.

### A.     The Objective Test

The objective test involves a broad examination of whether, from an objective standpoint, the transaction would likely produce economic benefits other than the generation of a tax deduction.  Kirchman v. Commissioner, 862 F.2d 1486, 1492-1494 (11th Cir. 1989), aff'g Glass v. Commissioner, 87 T.C. 1087 (1986).  "A reasonable opportunity for profit will ordinarily be found only if there was a legitimate expectation that the nontax benefits would be at least commensurate with the associated transaction costs."  Rovakat, LLC v. Commissioner, T.C. Memo. 2011-225, slip op. at 38, aff'd, 529 F. App'x 124 (3d Cir. 2013).

In regard to whether their CARDS transactions lacked economic substance, petitioners contend that the Court must consider its "capital leverage" plan.  In other words, petitioners contend that they entered into the CARDS transactions to

**[\*28]** obtain proceeds for investment and that the Court should consider their investment purpose in determining whether the CARDS transactions objectively had economic substance. Other taxpayers have made similar arguments in CARDS transaction cases, and we have consistently rejected those arguments. See Kipnis v. Commissioner, at \*26-\*28; Country Pine Fin., LLC v. Commissioner, T.C. Memo. 2009-251, slip op. at 35. Although petitioners urge this Court to consider the profit potential from the investments purchased with proceeds from the CARDS transactions, we decline the invitation as we have previously and focus on the transaction "that gave rise to the tax loss". See Country Pine Fin., LLC v. Commissioner, slip op. at 35.[25] Because petitioners' capital leverage plan is not the transaction that gave rise to the tax loss, we do not consider whether it had economic substance. We review the CARDS transactions separately from the transfers of proceeds that petitioners used for their capital leverage plan.

---

[25]Petitioners contend that this Court and other courts have erred by analyzing the financing and investment decisions separately. Petitioners contend that this Court and other courts have limited the scope of review at the urging of Dr. Kolbe. We do not find merit in these arguments. This Court and other courts have not determined the scope of review to include only the transaction that gave rise to the tax loss solely because of Dr. Kolbe's opinion. See Am. Elec. Power Co. v. United States, 326 F.3d 737, 743 (6th Cir. 2003) ("[Courts should not] evaluate the transaction's profitability after the challenged deduction has been allowed. To do so would swallow the sham analysis entirely.").

[*29]  In reviewing the CARDS transactions without reference to the transfer of the proceeds to petitioners, we find Dr. Kolbe's report and related testimony persuasive that the CARDS transactions lacked economic substance.[26]  Dr. Kolbe's report shows that the CARDS transactions lacked profit potential.  The report states that the CARDS transactions reduced petitioners' wealth by €2.19 million and would have reduced it even more had the CARDS transactions lasted longer than one year.  These losses would exist no matter what investments petitioners made with the proceeds because the same investments could have been financed by a more conventional type of loan, and the artificial, unrelated losses would remain even if we accepted petitioners' position that we should consider the transfer of proceeds to them as part of the CARDS transactions.  See id.

Petitioners' expert reports were not helpful to the Court's analysis.  Dr. Ciccotello's expert report focuses on whether the decisions to enter the CARDS transactions were rational when considering projected returns from investments petitioners would make with proceeds from the CARDS transactions.  Because the

---

[26]Petitioners contend on brief that the Court should not admit Dr. Kolbe's testimony or reports because Dr. Kolbe has received substantial compensation from the Commissioner as an expert in previous cases.  Pursuant to sec. 7453, we apply the Federal Rules of Evidence, and Fed. R. Evid. 702 provides requirements for expert witnesses.  Dr. Kolbe has the required education and skills.  Petitioners raised similar arguments at trial, and we overruled their objection.  We find that petitioners' claims are without merit.

[*30] investment of the proceeds is not part of the transaction "that gave rise to the tax loss", see Country Pine Fin., LLC v. Commissioner, slip op. at 35, we do not find the report helpful or persuasive in evaluating the economic substance of the CARDS transactions at issue. Additionally, petitioners offered expert testimony from Mr. Walker. Mr. Walker's expert report addresses commercial lending practices and not the question of whether the transactions would objectively yield a profit. We also do not find Mr. Walker's report helpful because he does not address the economic substance of the CARDS transactions at issue.

Petitioners paid combined fees of $2,092,840 to Chenery to participate in the CARDS transactions. After paying those fees petitioners could not obtain investable proceeds unless they obtained collateral that was satisfactory to HVB.[27] As respondent's expert notes and we find persuasive, the financing costs were substantially above market rates for comparable financing options. As a result of the substantial financing costs, respondent's expert concluded that the costs "would create a very material, and entirely unnecessary, drag on the profitability" of an investment.

---

[27]Petitioners had to pay CIBC $241,200 for a letter of credit so they could withdraw investable proceeds. In total, petitioners paid $2,334,040 to obtain investable proceeds of $5,294,520.

**[\*31]** In sum, we find that the CARDS transactions did not objectively provide petitioners with a reasonable possibility of profit. Petitioners engaged in the CARDS transactions to create tax losses. Petitioners could have found less expensive financing options but did not even investigate other options. Before entering into the CARDS transactions, petitioners knew that the CARDS transactions would generate a tax loss and this was their motive. There was no genuine profit motive for these CARDS transactions, and any testimony to the contrary is simply not credible. Accordingly, petitioners fail to satisfy the objective test of the economic substance doctrine.

 B. The Subjective Test

Initially, we note that because the CARDS transaction that Curtis Investment entered into fails the objective test, the subjective motive is irrelevant. See Kirchman v. Commissioner, 862 F.2d at 1492. However, for the Court to determine that the CARDS transaction entered into by Mr. and Mrs. Baxter lacks economic substance, it must also fail the subjective test. See Black & Decker Corp., 436 F.3d at 441. The subjective test reviews the intent or business purpose of the taxpayer. Having a business purpose does not mean the reason for a transaction is free of tax considerations, but the purpose must be one that "figures in a bona fide, profit-seeking business." United Parcel Serv. of Am., Inc. v.

[*32] <u>Commissioner</u>, 254 F.3d at 1019. Thus, a transaction that would not have occurred in any form but for tax avoidance reasons does not have a business purpose. <u>Id.</u> at 1020; <u>see also</u> <u>Rice's Toyota World, Inc. v. Commissioner</u>, 752 F.2d at 94.

Petitioners contend that their business purpose was to obtain proceeds for investment. Assuming petitioners actually intended to leverage funds for investment purposes, we believe petitioners would have attempted to reduce their costs of borrowing and maximize the amount of funds available for investment. Instead, petitioners paid financing costs of approximately 45% of the proceeds of the loan and organized their CARDS transactions such that the transactions would result in losses close to the amount of taxable gains from the sale of ABP stock. Petitioners did not attempt to obtain any other loan in the last three months of 2000, nor did they attempt to maximize the amount that they could borrow for investment. Petitioners decided to use HVB, a bank with which they had no prior relationship, rather than banks with which they had existing relationships because borrowing money from those banks would not have provided petitioners with the tax losses that CARDS transactions promised. Accordingly, we do not find petitioners' purported investment motive credible.

[*33] Petitioners also contend that the proceeds were intended for long-term investments because the loans were intended to last for 30 years. However, petitioners knew or should have known that the CARDS transactions would not last for 30 years. The collateral securing 85% of the outstanding loans was in one-year time deposits. Petitioners purchased one-year forward contracts, and the letter of credit from CIBIC would terminate after one year without a renewal. Further, petitioners knew that HVB could call the loans on a yearly basis. Although Mr. Walker concluded that the ability to call a loan on a yearly basis is standard practice, facts in the record, such as the one-year time deposits and the one-year letter of credit, support an inference that these particular loans would not remain in place for 30 years.[28] We find that petitioners knew or should have known that the loans would not remain in place for 30 years.[29]

---

[28]We also conclude as a result of these facts that petitioners' testimony is not credible with respect to September 11, 2001, as the cause for HVB's calling the loans.

[29]Petitioners did seek replacement financing and ultimately found financing to satisfy their HVB obligations. In the fall of 2001 when petitioners were notified that HVB would terminate the loans, petitioners' investments had decreased and selling the investments would result in a loss. Therefore, petitioners' primary purpose in finding replacement financing was to avoid recognizing the losses. As Mr. Bird testified: "Well, if everything had been rosy, we'd been--you know, it'd be one thing, but things were terrible, because now we have to pull money out of the stock market when it's down, so it's going to cost us even more."

[*34]  Petitioners knew that they had substantial tax liabilities resulting from their sales of their ABP stock and immediately began considering ways to shelter the gains.  Petitioners considered other tax shelters before choosing the CARDS transactions and structured their CARDS transactions such that the losses would offset most of the gains and not to maximize investable proceeds.  Petitioners rushed to close the CARDS transactions before the end of 2000 because the transactions would shield the gains on their ABP stock, but they waited nearly six weeks before investing the funds.  Although petitioners and their advisers testified that the CARDS transactions' purported business purpose was for investment and would simply defer the tax that would ultimately be paid, we do not find their testimony credible.  We find that absent the substantial tax benefits, no rational taxpayer, including petitioners, would have entered into the CARDS transactions.  Accordingly, we conclude that petitioners did not have a business purpose for entering into the CARDS transactions.

C.     Loan Origination Fees

Respondent also disallowed deductions for loan origination fees with respect to Curtis Investment's CARDS transaction.  Fees incurred in connection with a transaction that lacks economic substance are generally not deductible.  See Winn-Dixie Stores, Inc. v. Commissioner, 113 T.C. 254, 294 (1999), aff'd, 254

[*35] F.3d 1313 (11th Cir. 2001); see also New Phoenix Sunrise Corp. v. Commissioner, 132 T.C. 161, 185-186 (2009), aff'd, 408 F. App'x 908 (6th Cir. 2010). However, courts have upheld deductions based on genuine debts where the debts were elements of a transaction lacking economic substance. See Rice's Toyota World, Inc v. Commissioner, 752 F.2d at 95-96. The parties did not list the CARDS transaction fees as an issue in their joint statement of issues filed with the Court, and therefore the transaction fees are not at issue. See Our Country Home Enters., Inc. v. Commissioner, 145 T.C. 1, 39 n.18 (2015) (treating an issue not raised in a memorandum of issues to be decided in the case as waived or otherwise abandoned). Even if the fees were at issue, the record confirms on the basis of the CARDS transactions' structure that Curtis Investment was not genuinely indebted. Consequently, we sustain respondent's disallowance of the deductions.

III.   Accuracy-Related Penalty

Respondent determined that petitioners are liable for accuracy-related penalties. A taxpayer may be liable for a 20% accuracy-related penalty on the portion of an underpayment of income tax attributable to: (1) negligence or disregard of rules or regulations, (2) a substantial understatement of income tax, or (3) a substantial valuation misstatement. Sec. 6662(a) and (b)(1)-(3). The penalty

**[*36]** increases to 40% to the extent that the underpayment is attributable to a

gross valuation misstatement. Sec. 6662(h)(1). An accuracy-related penalty under

section 6662 does not apply to any portion of an underpayment of tax for which a

taxpayer had reasonable cause and acted in good faith. Sec. 6664(c)(1).

Respondent determined the 40% accuracy-related penalty applies to any

portion of the underpayment related to the disallowed loss deductions as a result of

the CARDS transactions.[30] Petitioners argue that no accuracy-related penalty

applies because they had reasonable cause and acted in good faith. We now

address whether petitioners are liable for the 40% accuracy-related penalty.

A.  Gross Valuation Misstatement

Respondent determined a 40% accuracy-related penalty for a gross

valuation misstatement with respect to the losses reported from the CARDS

transactions. The gross valuation misstatement penalty is a 40% penalty that

---

[30]The record is unclear as to whether respondent determined an accuracy-related penalty with respect to Curtis Investment's disallowed transaction costs. Respondent determined that Curtis Investment was liable for an accuracy-related penalty for a gross valuation misstatement as a result of its promissory note's inflated basis. See sec. 6662(h). As an alternative to an accuracy-related penalty for a gross valuation misstatement, respondent determined that Curtis Investment was liable for an accuracy-related penalty for negligence or a substantial understatement of income tax. See sec. 6662(b)(1) and (2). Accordingly, because we hold that Curtis Investment is liable for an accuracy-related penalty for a gross valuation misstatement, we do not address respondent's alternative position.

[*37] applies to any portion of an underpayment of tax required to be shown on a return that is due to the taxpayer's overstating the value of, or his adjusted basis in, property by 400% or more of its true value or adjusted basis (as the case may be). Sec. 6662(h). When a property's true basis is zero, the gross valuation misstatement penalty is automatically triggered if the taxpayer claimed on his tax return that the property had any basis at all. Sec. 1.6662-5(g), Income Tax Regs.

The Commissioner bears the burden of production with respect to the taxpayer's liability for a section 6662(a) penalty and must produce sufficient evidence indicating that it is appropriate to impose the penalty. See sec. 7491(c); Higbee v. Commissioner, 116 T.C. at 446-447. Once the Commissioner meets his burden of production, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect or that the taxpayer had reasonable cause or substantial authority for the position. See Higbee v. Commissioner, 116 T.C. at 446-447.

Our holding that the CARDS transactions lack economic substance results in the total disallowance of the loss deductions without regard to the value or bases of the property used in the CARDS transactions. See Leema Enters., Inc. v. Commissioner, T.C. Memo. 1999-18, aff'd sub nom. Keeler v. Commissioner, 243 F.3d 1212 (10th Cir. 2001). The gross valuation penalty applies when an

[*38] underpayment stems from deductions or credits that are disallowed because of lack of economic substance. See United States v. Woods, 571 U.S. ___, 134 S. Ct. 557 (2013); Gustashaw v. Commissioner, T.C. Memo. 2011-195. Consequently, respondent has satisfied his burden of production, and the 40% gross valuation misstatement applies to petitioners' underpayments absent a showing of reasonable cause.

B.    Reasonable Cause and Good Faith

The accuracy-related penalty does not apply with respect to any portion of the underpayment for which the taxpayer shows that there was reasonable cause and that he or she acted in good faith. Sec. 6664(c)(1). The decision as to whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all of the pertinent facts and circumstances, including the experience, knowledge, and education of the taxpayer. See sec. 1.6664-4(b)(1), Income Tax Regs. "Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer." Id.

Partner-level defenses, including reasonable cause and good faith, may not be asserted in a partnership-level TEFRA proceeding such as the one we have

**[\*39]** here.  See New Millennium Trading, L.L.C. v. Commissioner, 131 T.C. 275, 288-289 (2008).  But when the reasonable cause defense rests on the partnership's actions, such as in the cases here, we may entertain the defense at the partnership level, "taking into account the state of mind of the general partner."  Superior Trading, LLC v. Commissioner, 137 T.C. 70, 91 (2011), aff'd, 728 F.3d 676 (7th Cir. 2013).

Petitioners contend that they had reasonable cause and acted in good faith because the CARDS transactions present a novel issue and that they reasonably relied on the advice of tax professionals.  We address both below.

### 1.    Novel Issue

This Court has previously found that a taxpayer acted with reasonable cause and good faith when a deficiency is the result of an issue of first impression and the taxpayer's position is reasonably debatable.  See Williams v. Commissioner, 123 T.C. 144, 153-154 (2004).  Likewise this Court has found reasonable cause and good faith when a taxpayer takes a position on an initial interpretation of a statute and the statutory text is unclear.  See Bunney v. Commissioner, 114 T.C. 259, 266 (2000).  However, regardless of whether the legal issue is novel, the Court considers all of the facts and circumstances in determining whether a

[*40] taxpayer acted with reasonable cause and in good faith. See sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioners contend that the issues raised by the CARDS transactions in these cases are novel issues. Although at the time petitioners filed their returns no CARDS transactions cases had been litigated, the requirement that a transaction have economic substance has been a longstanding principle of tax law. See, e.g., Gregory v. Helvering, 293 U.S. at 468-470; Winn-Dixie Stores, Inc. v. Commissioner, 113 T.C. at 277-280. In fact, Brown & Wood offered an opinion with respect to economic substance of the CARDS transactions that was allegedly based on representations of the parties. Respondent had also already taken a position in Notice 2000-44, 2000-2 C.B. 255, unfavorable to CARDS transactions, and Brown & Wood discussed respondent's position in its model opinion letter. Even if petitioners' CARDS transactions presented novel issues, which they do not, petitioners' position is not reasonably debatable and petitioners did not prove that they acted with reasonable cause and in good faith.

2.    Reliance on Tax Advisers

Petitioners also assert that they acted with reasonable cause and in good faith because they reasonably relied on the advice of their tax advisers. Reliance on the advice of a tax professional may, but does not necessarily, establish

**[*41]** reasonable cause and good faith for the purpose of avoiding a section 6662(a) penalty. United States v. Boyle, 469 U.S. 241, 251 (1985). A taxpayer's reliance on a competent tax professional may establish reasonable cause and good faith when the taxpayer provides necessary and accurate information to the adviser and the taxpayer reasonably relies in good faith on the adviser's judgment. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). In cases where the tax adviser has an inherent conflict of interest of which the taxpayer knew or should have known, a taxpayer's reliance on the adviser's opinion is unreasonable. See Canal Corp. v. Commissioner, 135 T.C. 199, 218 (2010); Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 98-99.

The parties dispute whether petitioners' tax advisers were competent professionals that had sufficient expertise to justify reliance and whether petitioners relied in good faith on the advisers' judgment. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 99.

Brown & Wood provided petitioners a model tax opinion before petitioners entered into the CARDS transactions and finalized opinion letters after petitioners had already engaged in the CARDS transactions. The tax opinions were promised as part of petitioners' entering into the CARDS transactions, and a portion of the

[*42] fees that petitioners paid Chenery were used to pay Brown & Wood. The tax opinion was marketed as a means of eliminating penalty risk. Because Chenery promised to provide the tax opinion from Brown & Wood as part of petitioners' entering into the CARDS transactions, petitioners and their advisers knew or should have known that Brown & Wood had an inherent conflict of interest. A taxpayer's reliance on an adviser with an inherent conflict is not justified or reasonable. See CNT Inv'rs, LLC v. Commissioner, 144 T.C. 161, 226 (2015).

Petitioners contend that even if Brown & Woods had a conflict of interest, they relied on their longtime tax advisers to evaluate the CARDS transactions. Although a taxpayer generally does not reasonably rely on the advice of a tax adviser when the adviser relies on information from a third party that is a promoter of a tax shelter, under some facts and circumstances reliance may be reasonable. See id.; sec. 1.6664-4(c)(1)(ii), Income Tax Regs.

Petitioners cite CNT as a case analogous to their case. In CNT the taxpayers, Mr. and Mrs. Carroll, owned a chain of successful funeral homes. Mr. Carroll was an aging World War II veteran, held a degree in mortuary science, and had no sophisticated tax or financial knowledge. In fact, the taxpayers had never invested in mutual funds or securities, had no diversified investments, and held

[*43] their savings principally in cash. In an attempt to maintain a steady stream of income during retirement, the taxpayers in CNT decided to sell the funeral homes but maintain the real property. However, after discussing the proposed sale, the taxpayers' longtime advisers determined that transferring the real property from the funeral home business would create substantial gains as a result of the taxpayers' low basis. After various presentations, meetings, and phone calls, Mr. Carroll's advisers recommended a Son-of-BOSS transaction. See CNT Inv'rs, LLC v. Commissioner, 144 T.C. at 169 n.7. As in petitioners' case, the promoters of the Son-of-BOSS transaction in CNT provided a tax opinion that the taxpayers' advisers reviewed. Id. at 171.

In deciding whether Mr. Carroll's tax advisers had sufficient expertise to justify reliance, we noted that the issue is a "close one." Id. at 227. However, we ultimately held that the taxpayers in CNT had reasonable cause and acted in good faith. Id. at 235. The taxpayers were not sophisticated with respect to tax or financial matters. Mr. Caroll's tax advisers had also reviewed materials independent of the tax opinion that was promised as part of the Son-of-BOSS transaction.

Petitioners' case is distinguishable from CNT. The taxpayers' advisers in CNT took steps to complete an independent analysis. Although petitioners took

[*44] steps to independently investigate Chenery and HVB, their advisers relied solely on the legal analysis within the Brown & Wood model opinion letter in concluding that petitioners should enter into the CARDS transactions. The advisers checked some of the materials cited in the model opinion letter but did not conduct any legal research of their own, and on the basis of this scant review petitioners' advisers recommended the CARDS transactions. Mr. Bird knew his advisers relied solely on the model opinion letter from Brown & Wood in formulating their opinion.[31] Petitioners and their advisers should have known to conduct an independent legal analysis in the light of the inherent conflict of interest created by the relationship between Brown & Wood and Chenery.[32]

Although the taxpayers' advisers in CNT reviewed only a few sources other than the opinion letter provided by the promoter, the expertise and sophistication

---

[31]The model opinion letter discusses Notice 2000-44, supra, warning taxpayers about tax shelters similar to Son-of-BOSS and CARDS. Mr. Bird testified that he went over this model opinion letter with Mr. Rogers "paragraph by paragraph". Consequently, if Mr. Bird's testimony is truthful, he and his advisers discussed the notice. While the notice is not dispositive of the issue, we find it surprising that Mr. Bird did not ask his advisers to conduct a more extensive review considering respondent's position. Additionally, the Court in CNT was unable to conclude whether the taxpayers were aware of this notice. See CNT Inv'rs, LLC v. Commissioner, 144 T.C. 161, 231 (2015).

[32]Mr. Hahn listed Mr. Ruble, a lawyer at Brown & Wood, as a reference on documents he provided to petitioners. Mr. Ruble is the attorney who was petitioners' contact at Brown & Wood.

[*45] of the taxpayers in CNT were materially different from petitioners'. Both Mr. Bird and Mrs. Baxter had sophisticated financial knowledge. Mrs. Baxter was an assistant manager or manager of Curtis Investment for nearly 20 years. Mr. Bird had served as manager of Curtis Investment for approximately three years at the end of 2000. Mr. Bird also had a business degree and was president of Birdhouse Mortgages. Both had experience working with financing transactions and financial institutions. Although petitioners were sophisticated with respect to financial matters, they did not question the costs of the CARDS transactions. Petitioners did not seek or even investigate other financing options, yet they contend that the principal purpose of engaging in the CARDS transactions was to obtain funds to invest. If in fact petitioners intended to obtain funds to leverage, a businessperson with petitioners' experience would have investigated alternative financing arrangements that might have proved less expensive than the CARDS transactions.

The Court also notes that petitioners introduced into evidence several documents to prove an investment motive, but the record is devoid of any discussions regarding the tax benefits of the CARDS transactions. However, from the record as a whole, the Court is convinced that the tax benefits of the CARDS transactions were discussed. Petitioners, who were sophisticated in business,

**[*46]** should have known that these benefits were too good to be true. We conclude that petitioners' reliance was not reasonable or in good faith.

In conclusion, we find, on the basis of all the facts and circumstances, that petitioners failed to establish the reasonable cause and good-faith defense to the accuracy-related penalty. Accordingly we sustain respondent's determination that petitioners are liable for the 40% accuracy-related penalty.

We have considered the parties' remaining arguments, and to the extent not discussed above, conclude those arguments are irrelevant, moot, or without merit.[33]

To reflect the foregoing,

<u>Appropriate decisions will be entered</u>.

---

[33]The parties also asked the Court to decide: (1) whether Mrs. Baxter pursued the CARDS transaction with an intent to make a profit; (2) whether petitioners' liabilities, in excess of the cash received from HVB, constituted genuine indebtedness; and (3) to what extent Mrs. Baxter was at risk for the CARDS transaction at the close of the taxable year 2000. However, because we find that the CARDS transactions lacked economic substance and the loss deductions are disallowed, we do not need to resolve these issues.