T.C. Memo. 2014-132

UNITED STATES TAX COURT

COLIN B. HUNTER AND ALEXIA GILMORE, Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 25270-07, 22855-08.　　　　　Filed July 1, 2014.

<u>William F. Colgin Jr.</u>, <u>Christina K. Harper</u>, and <u>William B. Clayton</u>, for

petitioners.

<u>Gregory M. Hahn</u> and <u>Nick G. Nilan</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HAINES, <u>Judge</u>:  Respondent determined deficiencies of approximately

$2.7[1] million in petitioners' Federal income tax for 2001, 2002, and 2004 (years at

_____

[1]All monetary amounts are rounded to the nearest dollar.  Unless otherwise
indicated, all section references are to the Internal Revenue Code (Code), as
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　(continued...)

**[*2]** issue).  The issue for decision is whether petitioners are entitled to deduct certain losses from a Custom Adjustable Rate Debt Structure (CARDS) transaction.[2]

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  We incorporate the stipulations of facts, the second stipulation of facts, and the accompanying exhibits by this reference.  In our findings of fact and opinion, we use such terms as "loan", "principal", "interest", "collateral", "redemption", "purchase", "acquired", and "sale" only for convenience and not to denote any legal significance.

Petitioners resided in California when they filed the petitions.

---

[1](...continued)
amended and in effect for the taxable years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Respondent disallowed $22,491 of expenses petitioners claimed on the Schedule C, Profit or Loss From Business, attached to their 2004 tax return. Respondent has conceded that the claimed expenses are allowable as a miscellaneous itemized deduction on Schedule A, Itemized Deductions.  The deduction, however, is subject to the sec. 67(a) limitation that individuals may deduct miscellaneous itemized deductions "only to the extent that the aggregate of such deductions exceeds 2 percent of adjusted gross income."

We note that the deficiency notice did not include an accuracy-related penalty determination, and respondent did not raise the penalty in these cases.

**[*3]** I. Background

Colin Hunter (petitioner) was a cofounder of Transmeta Corp. (Transmeta), a technology company. Petitioner acquired a large number of Transmeta shares through an initial public offering (IPO) in November 2000. Petitioner agreed not to sell his Transmeta shares from the date of the IPO until May 2001. The price of Transmeta stock declined sharply during the months following the IPO. During the years at issue petitioner periodically sold Transmeta stock, generating over $16 million in capital gains. Most of the capital gains were realized in 2001.

II. The CARDS Transaction

In late 2001 petitioner entered into a CARDS transaction promoted by Chenery Associates, Inc. (Chenery). Petitioner paid his financial and tax adviser, myCFO, Inc. (myCFO), and Chenery fees totaling $2.42 million to arrange the transaction which was implemented through a series of steps.

A. The Lender and the Initial Borrower

Chenery arranged for Bayerische Hypo-Und Vereinsbank, AG (HVB), a German-based bank and financial institution operating in the United States through a branch in New York, to serve as the lender in petitioner's CARDS transaction. HVB participated in the CARDS transaction in all material respects through its agent HVB Structured Finance, Inc. (HVB Structured), a subsidiary of

**[*4]** HVB (for convenience and simplicity, HVB and HVB Structured are referred to collectively as HVB hereinafter).

In July 2001 Perivale Financial Trading LLC (Perivale) was organized as a Delaware limited liability company for the sole purpose of serving as the initial borrower in a CARDS transaction. Perivale was owned entirely by two members, Michael Sherry and Elisabeth Sylvester, who were citizens and residents of the United Kingdom.

B. The Loan Origination Phase

In early August 2001 Perivale entered into a credit agreement with HVB whereby HVB purportedly agreed to lend Perivale €41 million (HVB loan). The stated term of the HVB loan was 30 years. Interest accrued and was payable annually, except for the first year of the HVB loan, which had a 1-month interest period and then an 11-month interest period. The stated interest rate was the London interbank rate for deposits in euro (EUR LIBOR) plus a spread. For the first two interest periods the stated interest rate equaled approximately 4.65%. The entire principal amount of the HVB loan was due at maturity. However, HVB could require Perivale to prepay the full amount of the HVB loan at the end of each interest period following the second interest period, effectively making the HVB loan a one-year revolving credit facility.

[*5] The credit agreement also included, as well as other agreements executed in connection with the HVB loan, terms governing the pledge and use of collateral. Perivale was required to maintain at all relevant times sufficient collateral with HVB to cover the HVB loan principal and accrued interest. Perivale also was required to grant HVB a first priority lien and security interest in the pledged HVB loan collateral and transfer to HVB complete dominion and control over the right, title, and interest in it. HVB also had sole discretion over how the loan collateral could be invested. If the HVB loan obligations exceeded the collateral value, Perivale had to either prepay a portion of the HVB loan equal to the excess or pledge additional collateral having a value sufficient to eliminate the excess. HVB could require Perivale to repay the HVB loan if Perivale failed to comply with its collateral obligations.

On August 13, 2001, Perivale requested that HVB fund the full amount of the HVB loan. HVB credited the €41 million of proceeds to an HVB account nominally held by Perivale. The funds in Perivale's HVB account were used to acquire a €34,294,199 HVB time deposit (HVB deposit) and a €6,722,885 promissory note payable by HVB (HVB note) to Perivale. Both the HVB deposit and the HVB note paid interest at a rate equal to EUR LIBOR (4.15388%) and matured at the end of the first year of the HVB loan. The HVB deposit and the

**[*6]** HVB note (collectively, initial HVB loan collateral) were held in Perivale's HVB account, which Perivale pledged as collateral for the HVB loan as well as any proceeds therefrom under certain agreements.

Petitioners were not involved in the formation of Perivale, its ownership, or the negotiation of the credit terms with HVB.

C.  The Purchase of the HVB Note and Assumption of the HVB Loan

On August 28, 2001, pursuant to a prearranged plan and a series of agreements, petitioner purchased the HVB note from Perivale.  In exchange petitioner agreed to assume joint and several liability for the HVB loan.  Perivale transferred the HVB note into an HVB account of petitioner (Hunter HVB account), which petitioner immediately pledged to HVB as collateral for his assumed HVB loan obligations.  HVB maintained a first priority lien and security interest in and retained complete dominion and control over both the HVB note and all other collateral pledged by petitioner (discussed infra) to HVB in connection with the CARDS transaction.

1.  Allocation of HVB Loan Obligations Between Petitioner and Perivale

Petitioner and Perivale agreed between themselves to allocate the HVB loan obligations as follows.  Perivale agreed to pay interest due on the HVB loan from,

**[*7]** and to the extent there was, HVB loan collateral.[3] Petitioner agreed to be responsible for all other HVB loan obligations (including maintaining required HVB loan collateral) to the extent not covered by the HVB loan collateral. Because the initial HVB loan collateral earned interest at EUR LIBOR, using it to make interest payments on the loan would cause the HVB loan obligations to exceed the HVB loan collateral by the spread each interest period. Consequently, petitioner was required to contribute additional HVB loan collateral each interest period equal in value to the spread amount accruing on the HVB loan for the corresponding interest period. As these contributions would be used to repay the HVB loan, petitioner effectively bore the cost of the spread.

### 2. Withdrawing HVB Loan Collateral

Petitioner could not withdraw pledged collateral (including the HVB note and any proceeds therefrom) unless he provided substitute collateral. Petitioner could not substitute collateral without HVB's prior written consent. HVB had sole discretion to withhold its consent and to determine the type and amount of acceptable collateral, if any. If substitute collateral was accepted, HVB could discount it depending on its quality.

---

[3]Perivale applied the HVB loan collateral to payment of interest first and to payment of principal only after all other obligations with respect to the loan had been satisfied.

**[\*8]** The record does not reflect that petitioner ever inquired with HVB about the feasibility of substituting as collateral his Transmeta stock or any other property that was not cash or a cash equivalent. Nor does the record reflect that HVB ever provided petitioner any assurance that the substitution of anything other than cash or a cash equivalent was feasible.

### D. The Operational Phase

#### 1. Pledges of Additional Collateral

In August 2001 petitioner deposited $2 million cash in a Northern Trust Co. account (NTC account) he had opened. On August 28, 2001, in anticipation of redeeming a portion of the HVB note and withdrawing the redemption proceeds, petitioner pledged, and HVB agreed to accept, his NTC account to HVB as substitute collateral. For purposes of valuing the NTC account, HVB applied a 12% discount.

On September 21, 2001, petitioner transferred another $1,211,868 into the NTC account (which was still pledged as collateral), bringing the balance in the account to $3,213,545. Thereafter petitioner twice made requests to HVB, to withdraw $800,000 and $70,000 from the NTC account. HVB approved the request to withdraw $800,000 on September 28, 2001, and the request to withdraw

[*9] $70,000 on October 19, 2001, after confirming that the NTC account balance would still exceed HVB's collateral requirements.

2. Redemptions of the HVB Note and Withdrawal of HVB Loan Collateral

Petitioner redeemed portions of the HVB note on three separate occasions. On August 29, 2001, he redeemed €1,698,578 of the HVB note and converted the euro proceeds to $1,552,500. Petitioner then transferred $940,000 of the converted proceeds to myCFO and the remaining amount ($612,500) to Chenery to pay fees associated with his CARDS transaction.

On October 24, 2001 petitioner redeemed €295,483 of the HVB note and converted the euro proceeds to $263,866. Petitioner transferred $80,000 of those proceeds to pay fees related to his CARDS transaction. The remaining $183,866 remained in the Hunter HVB account.

In mid December 2001 petitioner redeemed €557,400 of the HVB note. The redeemed proceeds were not converted to U.S. dollars and remained in the Hunter HVB account. Following the third redemption, the principal amount of the HVB note payable to petitioner was €4,171,424. Petitioner never redeemed this portion of the HVB note; rather, it remained in HVB's custody and control and was used to repay the HVB loan.

**[*10]**  In sum, HVB permitted petitioner to withdraw proceeds from the HVB note totaling $1,632,500, which was less than the initial $2 million placed in the NTC account.  Petitioner used the withdrawn proceeds to pay costs and fees associated with the transaction.  None of the proceeds were used for investment purposes.

### 3.  Foreign Exchange Forward Contracts

Petitioner entered into two foreign exchange forward (FX) contracts as part of the prearranged steps of his CARDS transaction.  On August 29, 2001, he entered into a FX contract to purchase €1,974,826 for $1,796,998 on August 13, 2002.  On October 24, 2001, petitioner entered into the second FX contract and agreed under it to purchase €305,472 for $270,893 on August 13, 2002.  The FX contracts eliminated the currency risk resulting from the first and second redemptions of the HVB note.

### E.  Unwinding the CARDS Transaction

On August 13, 2002, HVB notified petitioner it was terminating the HVB loan and declared the principal and accrued interest were due and payable.  Petitioner requested that HVB liquidate the assets in the Hunter HVB account to settle the FX contracts.  He further requested that HVB use those funds as well as funds available from the maturing HVB deposit and HVB note to satisfy his HVB

**[\*11]** loan obligations.  HVB repaid the HVB loan principal and interest with the collateral petitioner and Perivale had pledged to it.

III.  Tax Returns and Deficiency Notice

Petitioners timely filed Federal income tax returns for the years at issue. Petitioners treated as sales the three redemptions of the HVB note in 2001 and the maturity of the remaining portion of the HVB note in 2002.  They reported capital losses from those sales totaling $34,330,995 and used the losses to offset the $16,500,241 in capital gains from the Transmeta stock.  Petitioners calculated their losses by using a basis of $40,590,000 in the €6,722,885 HVB note. Petitioners took the position that their cost basis in the HVB note equaled the $38,171,000 principal amount of the HVB loan (€41 million × the exchange rate of 0.9310) plus $2,419,000 of the fees they paid to carry out the CARDS transaction.  For 2001 petitioners also claimed $40,104 of losses (FX losses) from the two FX contracts petitioner had entered into in connection with the CARDS transaction.

Respondent issued petitioners a deficiency notice, disallowing the losses from the HVB note and the FX contracts.  Petitioners timely filed petitions with this Court for redetermination.

**[*12]**                                              OPINION

We are asked to decide whether petitioners are entitled to deduct certain capital and ordinary losses from their CARDS transaction. Respondent contends that the capital losses from certain dispositions of the HVB note are disallowed under the economic substance doctrine and the losses from the FX contracts are disallowed under section 165(c).[4] Petitioners argue that the losses were claimed in accordance with the letter of the tax laws. They further contend that their CARDS transaction has economic substance because they entered into it for a business purpose and had a reasonable possibility of profiting from it. We address the tax consequences of the different losses in turn.

I. The Losses From the HVB Note

We have consistently held that CARDS transactions promoted by Chenery lack economic substance. See Kipnis v. Commissioner, T.C. Memo. 2012-306; Crispin v. Commissioner, T.C. Memo. 2012-70, aff'd, 708 F.3d 507 (3d Cir. 2013); Kerman v. Commissioner, T.C. Memo. 2011-54; aff'd, 713 F.3d 849 (6th Cir. 2013); Country Pine Fin., LLC v. Commissioner, T.C. Memo. 2009-251.

---

[4]Respondent also argues that petitioners' claimed losses from the HVB note must be disallowed under the loss rules in sec. 165, the at-risk rules in sec. 465, the substance over form doctrine, and the step transaction doctrine. We need not reach these arguments because of our holding that petitioners' CARDS transaction lacks economic substance.

[*13] Petitioners argue that their CARDS transaction is different because, unlike others, it allowed them to withdraw the CARDS "loan" proceeds from the bank. We disagree.

A taxpayer may not deduct losses resulting from a transaction that lacks economic substance, even if that transaction complies with the literal terms of the Code. See ACM P'ship v. Commissioner, 157 F.3d 231, 246 (3d Cir. 1998), aff'g in part, rev'g in part T.C. Memo. 1997-115; Lerman v. Commissioner, 939 F.2d 44, 45 (3d Cir. 1991), aff'g Fox v. Commissioner, T.C. Memo. 1988-570. Accordingly, we do not address the parties' arguments regarding the merits of petitioners' treatment of each step within the CARDS transaction. Instead, we begin our analysis with the general principles of the economic substance doctrine.[5]

A court may disregard a transaction for Federal income tax purposes under the economic substance doctrine if it finds that the taxpayer failed to enter into the transaction for a valid business purpose but rather sought to claim tax benefits not contemplated by a reasonable application of the language and purpose of the Code

---

[5]The taxpayer generally bears the burden of proving the Commissioner's determinations are erroneous. Rule 142(a). The burden of proof may shift to the Commissioner if the taxpayer satisfies certain conditions. Sec. 7491(a). Our resolution is based on a preponderance of the evidence, not on an allocation of the burden of proof. Therefore, we need not consider whether sec. 7491(a) would apply. See Estate of Bongard v. Commissioner, 124 T.C. 95, 111 (2005).

**[*14]** or its regulations. See, e.g., New Phoenix Sunrise Corp. & Subs. v.

Commissioner, 132 T.C. 161, 175 (2009), aff'd, 408 Fed. Appx. 908 (6th Cir.

2010); Palm Canyon X Invs., LLC v. Commissioner, T.C. Memo. 2009-288.

We are mindful that there is a split among the Courts of Appeals as to the

proper application of the economic substance doctrine. An appeal in this case lies

in the Ninth Circuit absent stipulation to the contrary. Accordingly, we follow the

law of that circuit. See Golsen v. Commissioner, 54 T.C. 742 (1970), aff'd, 445

F.2d 985 (10th Cir. 1971). To demonstrate that a transaction has economic

substance in the Ninth Circuit, a taxpayer must show: (1) a nontax business

purpose (a subjective analysis) and (2) that the transaction had economic

substance beyond the creation of tax benefits (an objective analysis). See, e.g.,

Reddam v. Commissioner, __ F.3d __, 2014 WL 2619692 (9th Cir. June 13,

2014), aff'g T.C. Memo. 2012-106; Bail Bonds by Marvin Nelson, Inc. v.

Commissioner, 820 F.2d 1543, 1549 (9th Cir. 1987), aff'g T.C. Memo. 1986-23;

see also Casebeer v. Commissioner, 909 F.2d 1360, 1363 (9th Cir. 1990), aff'g

T.C. Memo. 1987-628; Sochin v. Commissioner, 843 F.2d 351, 354 (9th Cir.

1988), aff'g Brown v. Commissioner, 85 T.C. 968 (1985). These distinct aspects

of the economic substance inquiry do not constitute discrete prongs of a rigid two-

step analysis but instead are related factors that inform the ultimate analysis of

[*15] whether the transaction has any practical economic effects beyond the creation of tax benefits. Sochin v. Commissioner, 843 F.2d at 354. The ultimate determination of whether a transaction lacks economic substance is a question of fact. Id. at 353.

### A. Objective Analysis

The objective economic substance inquiry involves a broad examination of "whether the substance of a transaction reflects its form, and whether from an objective standpoint the transaction was likely to produce economic benefits aside from a tax deduction". Bail Bonds by Marvin Nelson, Inc. v. Commissioner, 820 F.2d at 1549. Petitioners contend that their CARDS transaction served as a loan facility that enabled them to borrow money. We disagree.

The HVB note was pledged as collateral for the HVB loan, which was required to be fully collateralized during its term. HVB had complete dominion and control over the collateral pledged for the HVB loan. The only way petitioner could draw down the HVB note was by providing sufficient substitute collateral. The problem with this, however, was that HVB had sole discretion to reject any offer petitioner made to substitute collateral. Accordingly, petitioner never had the right to use the HVB note or any proceeds from it for his own benefit.

**[*16]**  To be sure, petitioner withdrew redemption proceeds from the HVB note totaling $1,632,500.  However, petitioner did not invest any of those funds. Rather he used them to pay fees associated with his CARDS transaction. Moreover, HVB allowed petitioner to withdraw the funds only after petitioner first pledged a $2 million NTC account as substitute collateral.  Accordingly, the value of the substitute collateral he pledged exceeded the value of the withdrawn redemption proceeds from the HVB note.  Thus, the withdrawn proceeds did not beneficially affect petitioners' economic position independent of taxes. Petitioners also argue that the CARDS transaction had objective economic substance because they stood to profit from it by investing the HVB note proceeds and by maintaining petitioner's investment in Transmeta.  Once again, we disagree.

We have consistently held that the relevant transaction to be tested is the one that produces the disputed tax benefit, even if it is part of a larger set of transactions or steps.  Bank of New York Mellon Corp. v. Commissioner, 140 T.C. 15, 33-34 (2013); Kipnis v. Commissioner, T.C. Memo. 2012-306; Country Pine Fin., LLC v. Commissioner, T.C. Memo. 2009-251.  The losses generated by petitioner's CARDS transaction did not arise from petitioner's investing any HVB note proceeds (which petitioner did not even have a right to withdraw) or from

**[*17]** petitioner's holding onto his Transmeta stock. The losses rather were the result of his acquisition and disposition of portions of the HVB note, which did not create any nontax benefits, only tens of million of dollars of artificial tax losses. Accordingly, the profits petitioners point to would be from separate and distinct transactions from the one giving rise to the disputed tax benefits and therefore are irrelevant to our economic substance inquiry.[6]

We find that petitioner's CARDS transaction and the losses resulting therefrom lacked objective economic substance.

B. Subjective Analysis

The subjective economic substance analysis involves considering the subjective factors that motivated a taxpayer to enter into the transaction at issue. Bail Bonds by Marvin Nelson, Inc. v. Commissioner, 820 F.2d at 1549. Petitioner contends he entered into the CARDS transaction because he believed it would allow him to use his Transmeta stock as collateral to borrow money for a venture

---

[6]We also note that petitioner did not have a reasonable expectation of profit from the purchase of the HVB note as a stand-alone investment. This is because the HVB note earned interest (or a return) that was less than the stated interest rate on the HVB loan. Accordingly, keeping the HVB note pledged as collateral for the HVB loan guaranteed a loss.

[*18] capital fund he planned to start.[7] We find this claim wholly unconvincing and belied by petitioner's conduct.

In the first place, it was unreasonable for petitioner to believe that he could use the CARDS transaction as a borrowing facility to obtain capital for a venture capital fund, or for that matter any business venture. Petitioner could not beneficially access or use the purported loan facility provided by his CARDS transaction without first substituting collateral. As previously explained, petitioner had no right to substitute collateral. Moreover, the record reflects that petitioner entered into the CARDS transaction without regard to whether HVB would accept his Transmeta stock as substitute collateral despite the substantial fees to enter into the transaction, over $2.42 million. Petitioner testified that he knew that HVB had sole discretion to accept or reject his Transmeta stock as substitute collateral. Nevertheless, the record does not reflect that petitioner, ostensibly a well-educated and astute business person, ever negotiated a right to

---

[7]Petitioner also contends that he entered into the CARDS transaction because he expected to profit from it. In this regard, he claims that he expected to profit from appreciation in his Transmeta stock and from returns on investments he expected to make with proceeds from the HVB loan. This claimed business purpose is predicated on petitioner's claim that he entered into the CARDS transaction because it allowed him to use his Transmeta stock as substitute collateral. Because we find that predicate lacks merit, it follows that petitioner's claim of a profit motive business purpose also lacks merit.

[*19] substitute his Transmeta stock as collateral, sought written assurances from HVB that it would accept his stock as substitute collateral, or even inquired with HVB about the feasibility of such an action before deciding to carry out his CARDS transaction. Nor is there any evidence that HVB ever considered allowing petitioner to substitute his Transmeta stock as collateral. Also telling, petitioner failed to make an offer to substitute his stock as collateral during the one-year period his CARDS transaction was in effect. We do not find petitioner's claimed business purpose credible.

### C. Conclusion

In conclusion, we hold that petitioner's CARDS transaction did not have any practical economic effects beyond the creation of tax benefits and therefore lacks economic substance. Accordingly, we further hold the capital losses from the sales or dispositions of portions of the HVB note are disallowed.

## II. The Losses From the FX Contracts

Petitioners contend that they are entitled to deduct the losses from the FX contracts. Subject to certain limitations, any uncompensated loss sustained during the taxable year is deductible. See sec. 165(a). In the case of an individual, the losses deductible under section 165(a) are limited to: (1) losses incurred in a trade or business, (2) losses incurred in any transaction entered into for profit, though

[*20] not connected with a trade or business, and (3) with respect to property not connected with a trade or business or a transaction entered into for profit, a casualty or theft loss. Sec. 165(c) (1), (2), and (3). Petitioners do not specify which loss limitation they rely on. However, only section 165(c)(2) could possibly apply in this case. Respondent argues that the FX losses are not deductible under section165(c)(2) because petitioner did not enter into the FX contracts for profit. We agree.

Petitioner entered into the FX contracts in connection with his CARDS transaction. Petitioner contends that he expected to profit from the CARDS transaction by holding on to his Transmeta stock and by investing the HVB loan proceeds. We have previously held that any such profit would be attributable to a distinct and separate transaction from petitioner's CARDS transaction. Petitioners have not otherwise established that the ordinary losses from the FX contracts were incurred in a transaction entered into for profit under section 165(c)(2). Accordingly, we sustain respondent's disallowance of those losses.

We have considered all remaining arguments the parties made and, to the extent not addressed, we find them to be irrelevant, moot, or meritless.

**[\*21]**   To reflect the foregoing,

Decisions will be entered under

Rule 155.