T.C. Memo. 2018-100

UNITED STATES TAX COURT

ROY E. HAHN AND LINDA G. MONTGOMERY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 1910-14.                          Filed July 2, 2018.

<u>John Edward Williams</u>, for petitioners.

<u>Audra M. Dineen</u> and <u>Ina Susan Weiner</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

NEGA, <u>Judge</u>:  Respondent determined deficiencies in petitioners' Federal

income tax and imposed an accuracy-related penalty under section 6662(a)[1] as

follows:

---

[1]Unless otherwise indicated, all section references are to the Internal
Revenue Code (Code) in effect for the years at issue, and Rule references are to
the Tax Court Rules of Practice and Procedure.

[*2]

| Year | Deficiency | Penalty sec. 6662(a) |
|------|-----------|----------------------|
| 2000 | $427,951 | $695,249 |
| 2007 | 24,569 | -0- |

The issue for decision for petitioners' taxable year 2000 is whether petitioners are entitled to deduct certain losses from a Custom Adjustable Rate Debt Structure (CARDS) transaction.[2]

FINDINGS OF FACT

Some of the facts are stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioners resided in California when they timely filed the petition.

I.    Background

A.    Petitioner Roy E. Hahn

In 1974 Roy E. Hahn earned a bachelor's degree in accounting from San Francisco State University. From 1974 to 1976 Mr. Hahn worked as an auditor for the accounting firm PriceWaterhouse (PW) (now known as PriceWaterhouseCoopers). In 1976 he became a certified public accountant

_____

[2]We do not resolve here the issue of petitioners' liability for the accuracy-related penalty under sec. 6662(a) for tax year 2000. That penalty will be the subject of a future opinion to be issued by this Court.

[*3] (C.P.A.). From 1976 to 1984 he worked in the tax department of PW. From 1984 to 1987 he worked in the tax department for the accounting firm Arthur Young (now known as Ernst & Young).[3] From 1987 to 1993 he worked in the tax department for the accounting firm Coopers & Lybrand (now known as PriceWaterhouseCoopers). From 1993 to 2003 he was a tax partner at Coopers & Lybrand. While he was a member of the tax department of each accounting firm, his duties included preparing tax returns, conducting tax research, and giving tax advice to clients.

B.    Petitioner Linda G. Montgomery

In 1981 Linda G. Montgomery earned a master's degree in accounting from California State University, Hayward (now known as California State University, East Bay). In 1984 she earned a master's degree in taxation from Golden Gate University. From 1981 to 1985 she worked for Arthur Young. From 1986 to 1991 she worked as a tax manager for Coopers & Lybrand. Since 1991 she has worked as a self-employed C.P.A.

---

[3]From 1984 to 1987 Mr. Hahn was a tax partner at Arthur Young.

**[*4]** C.    <u>Chenery Associates, Inc.</u>

In 1993 petitioners incorporated Chenery Associates, Inc. (Chenery), as a wholly owned subchapter S corporation to work on structured transactions with investment banks in New York.[4]  Because Chenery was a subchapter S corporation, its profits flowed through to its shareholders, Mr. Hahn and Ms. Montgomery, with their share of the profits shown on their Schedules E, Supplemental Income and Loss.

In 1998 Chenery started arranging financial transactions for its clients, including the CARDS transaction.  Mr. Hahn, R.J. Ruble, an attorney at Brown and Wood,[5] and others had collaboratively created the CARDS transaction earlier that year.  After its creation, on May 19, 1998, Mr. Hahn, on behalf of Chenery, and Mr. Ruble, on behalf of Mr. Ruble's Family Investment Statutory Trust, entered into a licensing agreement.  That agreement provided that Chenery would

---

[4]In 2004 Chenery changed its name to Sussex Financial Enterprises, Inc. Petitioners wholly owned Sussex, each with a 50% interest.  Petitioners also owned directly or indirectly other entities including:  (1) Chenery Management, Inc.; (2) Chenery Capital Management, Inc.; (3) Chenery Capital, Inc.; and (4) Chenery Trading Partnership.

[5]In May 2001 Brown and Wood merged with the law firm of Sidley and Austin to become Sidley, Austin, Brown, and Wood.

**[*5]** pay Mr. Ruble's Family Investment Statutory Trust an annual royalty as well as a contingent royalty for every CARDS transaction Chenery closed.[6]

In addition Chenery generally charged a fee for arranging a CARDS transaction. Chenery then used a portion of the fee to pay third parties involved in the specific CARDS transaction, including their own legal counsel.[7]

Between 1999 and 2001 Chenery promoted, marketed, and sold 65 CARDS transactions. Mr. Ruble's law firm, Brown and Wood, was heavily involved in the majority of those transactions. In fact Michael G. Wolfson, a partner at Brown and Wood, assisted in drafting the transaction documents necessary to implement the CARDS transaction for at least 50 of those CARDS transactions.[8] Further, during that time Mr. Hahn worked specifically with Mr. Ruble and his law firm, Brown and Wood, to procure an opinion that endorsed the transaction's legality

---

[6]Pursuant to the licensing agreement, between 2000 and 2002 Chenery paid $1,850,000 to Mr. Ruble's Family Investment Statutory Trust.

[7]On January 1, 2001, Chenery had paid Brown and Wood $2 million in legal fees. As of February 27, 2001, Chenery still owed Brown and Wood $1,855,000 in legal fees for services rendered.

[8]From 1999 to 2001 Mr. Wolfson also drafted and filed formation documents for each of the LLCs involved in CARDS transactions, prepared credit agreements, purchase agreements, and assumption agreements.

[*6] and tax benefits.[9]  Mr. Hahn also paid Brown and Wood to provide tax opinions for other parties that entered into CARDS transactions.

During 2000 Chenery's arranging and marketing of CARDS transactions generated $4,346,254 of ordinary taxable income.  In late 2000 petitioners entered into a CARDS transaction in order to reduce their tax liability.

II.    Petitioners' Entry Into the CARDS Transaction

CARDS transactions are not new to this Court.  See generally Curtis Inv. Co., LLC v. Commissioner, T.C. Memo. 2017-150; Hunter v. Commissioner, T.C. Memo. 2014-132; Crispin v. Commissioner, T.C. Memo. 2012-70, aff'd, 708 F.3d 507 (3d Cir. 2013); Kerman v. Commissioner, T.C. Memo. 2011-54, aff'd, 713 F.3d 849 (6th Cir. 2013); Country Pine Fin., LLC v. Commissioner, T.C. Memo. 2009-251, 2009 WL 3678793.  As noted above, Chenery marketed and developed the CARDS transaction, including the CARDS transaction at issue.

In December 2000 Mr. Hahn realized that he could personally benefit from a CARDS transaction.  Before entering into such a transaction, he sought out and received legal advice.  He received two tax opinions, one from Brown and Wood, dated December 31, 2000, and the other from LeBoeuf, Lamb, Green, and

---

[9]Mr. Hahn also provided input to Brown and Wood on their draft opinions concerning the CARDS transaction.

[*7] MacRae, dated January 11, 2002.[10]  Those tax opinions were drafted by Mr. Ruble and Graham Taylor, respectively.

III.    The CARDS Transaction

A CARDS transaction typically has three stages:  (1) loan origination, (2) loan assumption, and (3) loan operation.[11]  The CARDS transaction at issue also had three stages, which are described below.

A.    Origination

On November 21, 2000, Elizabeth A.D. Sylvester and Michael Sherry,[12] residents of the United Kingdom, organized Whitechapel Financial Trading, LLC (Whitechapel), as a Delaware LLC for the sole purpose of facilitating petitioners' CARDS transaction.  Ms. Sylvester and Mr. Sherry capitalized Whitechapel solely through the use of promissory notes.

---

[10]The latter tax opinion refers to Brown and Wood as Sidley, Austin, Brown, and Wood.

[11]In general three parties are required to carry out a CARDS transaction:  (1) a bank, (2) a borrower, and (3) an assuming party.  For a detailed overview of the phases and interaction of the parties in a CARDS transaction, see Kerman v. Commissioner, T.C. Memo. 2011-54, aff'd, 713 F.3d 849 (6th Cir. 2013).

[12]Ms. Sylvester and Mr. Sherry are not strangers to this Court.  Each has participated in other CARDS transactions that have come before us, for example, in Country Pine Fin., LLC v. Commissioner, T.C. Memo. 2009-251, where they established another Delaware LLC that acted as a borrower in that matter.

**[*8]**   On December 4, 2000, Whitechapel and Bayerische Hypo-Und

Vereinsbank, AG (HVB), a bank based in Germany, entered into a credit

agreement whereby HVB agreed to lend Whitechapel €5,800,000 (HVB loan) for

a stated 30-year period.  Interest on that loan accrued annually with the exception

of the first year, which had a 1-month interest period and then an 11-month

interest period.  The interest rate for those periods was equal to the 12-month euro

LIBOR rate (5.0325%) plus a spread of 0.5% (5.5325%).

Thereafter, HVB could reset the interest rate annually on the spread reset

date.[13]  On each spread reset date, HVB also had the unilateral right to call the

loan.  Therefore, despite the fact that the credit agreement had a stated 30-year

period, the HVB loan was effectively a 1-year revolving credit facility with a

cancellation option in favor of HVB.

The credit agreement also required different levels of collateralization

depending upon the quality of the collateral.  If the collateral consisted of cash or

an acceptable cash equivalent, then Whitechapel was required to deposit collateral

equal to 102% of its obligations to HVB.  If the collateral consisted of other

---

[13]The "spread reset date" was the last day of an interest period.  As noted above, an interest period was one year, with the exception the first two interest periods, which were 1 month and 11 months, respectively.

**[\*9]** assets, then Whitechapel was required to deposit collateral equal to 108% of its obligations to HVB.

On December 4, 2000, Whitechapel and HVB also entered into a master pledge and security agreement (MPSA), whereby Whitechapel pledged, in addition to other property rights, all of its property rights in its deposit accounts and security accounts as collateral to HVB for the HVB loan. On the same day, HVB deposited €5,800,000 (HVB loan proceeds) to Whitechapel's account at HVB (Whitechapel's account).[14] That day, Chenery also transferred €2,417 to Whitechapel's account because HVB required Whitechapel to provide additional collateral.

Thereafter, Whitechapel purchased a €5,802,417 time deposit at HVB (Whitechapel time deposit). That time deposit was set to mature in one year, on December 4, 2001, and paid interest at a rate equal to the 12-month euro LIBOR (5.0325%). The interest that Whitechapel earned from HVB on the Whitechapel time deposit was 0.5% less than the interest Whitechapel owed to HVB on the

---

[14]Pursuant to the MPSA, the HVB loan proceeds were used as collateral for the HVB loan.

[*10] HVB loan.[15]  Pursuant to the MPSA, Whitechapel pledged its time deposit as collateral for the HVB loan.

### B.    Loan Assumption

On December 20, 2000, pursuant to a prearranged plan and series of arrangements, Chenery, HVB, and Whitechapel entered into an assumption agreement whereby Chenery agreed to assume joint and several liability for the HVB loan.[16]  In exchange, Whitechapel agreed to release €870,000 of the HVB deposit to Chenery.  In conjunction with the assumption agreement, on December 20, 2000, Chenery also deposited €1,200,770 ($1,092,701) into an HVB account

---

[15]The €2,417 that Chenery transferred to Whitechapel's account on December 4, 2000, equaled the difference between one month of interest earned from HVB on the Whitechapel time deposit and one month of interest Whitechapel owed to HVB on the HVB loan (i.e., the 0.5% spread).

[16]We note that there are inconsistencies in the record with respect to the date Chenery, HVB, and Whitechapel entered into the assumption agreement.  The parties stipulated Chenery, HVB, and Whitechapel entered into the assumption agreement on December 22, 2000.  However, the assumption agreement itself is dated December 20, 2000.  Further, in the Form 4797, Sales of Business Property, attached to Chenery's Form 1120S, U.S. Income Tax Return for an S Corporation, for its tax year 2000, Chenery listed the assumption date as December 15, 2000.
Regardless of the date Chenery entered into the assumption agreement, the record reflects that Chenery did not discuss potential loan opportunities, nor did Chenery apply for any other loans, before deciding to enter into the assumption agreement with Whitechapel and HVB.  The record further reflects that petitioners assumed the loan in their individual capacity and then contributed that debt to Chenery in order to achieve better tax results.

[*11] as substitute collateral for the HVB loan as well as an additional $145,000 in time deposits with HVB.[17]

Further, Chenery and Whitechapel were obligated to pay with their own funds any shortfall in collateral balance. Because Whitechapel's collateral consisted of its time deposit, which earned interest at a rate that was 0.5% less than the interest Whitechapel owed to HVB on the HVB loan, Chenery was required to contribute additional collateral for each interest period equal in value to that spread amount.

Moreover, Chenery could not withdraw pledged collateral unless it provided substitute collateral. Chenery could not substitute collateral without HVB's prior written consent. HVB had sole discretion to withhold its consent and to determine the type and amount of acceptable collateral, if any. If HVB accepted the substitute collateral, it could discount it depending on its quality. However, the record does not reflect that Chenery ever requested to substitute collateral.

---

[17]At the time Chenery entered into the assumption agreement, petitioners were aware that HVB maintained a first priority lien and security interest in and retained complete dominion and control over the HVB loan proceeds and other collateral pledged by Whitechapel (discussed infra) to HVB in connection with the CARDS transaction.

According to respondent's expert, Darrell B. Chodorow, petitioners deposited the additional $145,000 to provide additional collateral to HVB as HVB required collateral deposits of at least 102% of the outstanding loan amount even with the collateral held in HVB time deposits.

**[\*12]** C.     Operational Phase

At a time not established by the record, but after Chenery, HVB, and Whitechapel entered into the assumption agreement, HVB transferred €870,000 from Whitechapel's HVB account to Chenery's HVB account.  On the same day, Chenery requested that HVB exchange the euro for U.S. dollars at a dollar-to-euro exchange rate of 0.930.[18]  Chenery also entered into a one-year forward contract with HVB.[19]  The forward contract required Chenery to sell U.S. dollars for euro on December 4, 2001, using a 0.952 exchange rate.  As a result of Chenery's claimed inflated basis from assuming liability for the full amount of the HVB loan, the exchange of euro to dollars resulted in a $4,334,456 purported loss for Chenery.

IV.     Unwinding the CARDS Transaction

On November 13, 2001, Chenery received notice from HVB that HVB intended to call the loan and declared the principal and accrued interest were due

---

[18]Chenery later deposited the HVB deposit of $809,100 (€870,000) as a time deposit at HVB.  That time deposit had an interest rate of 5.97% and was set to mature on December 4, 2001 (i.e., the one year anniversary of the HVB loan).

[19]A forward contract is a contract that allows two parties to buy or sell an asset at a specified time for a specified amount.  In this case the forward contract allowed Chenery to convert U.S. dollars back into euro at a specified exchange rate.  See Kipnis v. Commissioner, T.C. Memo. 2012-306, at \*15 n.10.

[*13] and payable. The time deposits (i.e., the collateral) in Whitechapel's and Chenery's respective HVB accounts were used to repay the HVB loan obligations, including all interest. On December 4, 2001, the HVB loan was repaid in full.

## V. Tax Returns and Notice of Deficiency

Chenery timely filed Form 1120S for its tax year 2000. Petitioners attached to that return Form 4797, in which Chenery claimed a net loss of $4,334,456 from the "Sale of EUR Deposit".[20] Chenery treated the loss as ordinary under section 988. The ordinary loss substantially offset Chenery's income for 2000, reducing it from $4,346,254 to $11,798. Ms. Montgomery prepared Chenery's Form 1120S for its tax year 2000. Mr. Hahn signed that return.

Petitioners filed Form 1040, U.S. Individual Income Tax Return, for their tax year 2000. Petitioners attached to that return Schedule E, reporting $11,798 of flowthrough income from Chenery after accounting for the $4,334,456 ordinary loss. Ms. Montgomery prepared petitioners' return for their tax year 2000.

On December 5, 2005, petitioners filed Form 1040X, Amended U.S. Individual Income Tax Return, for their tax year 2000, claiming a net operating

---

[20]Chenery describes the loss from "Sale of EUR Deposit" on Form 4797 as acquired on December 15, 2000, for a cost basis of $5,099,360 and sold on December 28, 2000, for $764,904.

[*14] loss carryback from their tax year 2002 of –$7,285,166. Petitioners also filed a return for their tax year 2007.

Respondent issued petitioners a notice of deficiency that disallowed the $4,334,456 loss deduction attributable to the CARDS transaction and determined that they are liable for a 40% section 6662(a) accuracy-related penalty for tax year 2000 with respect to the loss reported from the CARDS transaction. Petitioners timely filed a petition for redetermination.

## VI.   The Expert Report

Respondent introduced Mr. Chodorow's expert report.[21] Mr. Chodorow holds a master's degree in business administration from the Yale School of Management and a bachelor's degree of arts in economics from Brandeis University. Mr. Chodorow's report: (1) assessed whether the CARDS transaction at issue offered petitioners a potential for profit and evaluated its effect on their economic position; (2) analyzed petitioners' claimed nontax business purpose and whether the CARDS transaction at issue would have met their borrowing needs; and (3) analyzed the availability of alternative financing. Mr. Chodorow concluded that the CARDS transaction was not economically rational because the

---

[21]Petitioners did not introduce an expert report into the record, nor did they call an expert to the stand.

**[\*15]** expected rate of return on the amount invested did not exceed or even equal

the "cost of capital", i.e., the expected rate of return in capital markets on

alternative investments of equivalent risk.  On the basis of his analysis, Mr.

Chodorow concluded that the net present value of the loan was −€156,068.[22]  A

typical loan has a net present value of zero.  In other words, the loan would reduce

petitioners' wealth by €156,068 regardless of the returns from the investments.

OPINION

I.     Burden of Proof

Tax deductions are a matter of legislative grace, and taxpayers have the

burden of proving that they are entitled to the deductions claimed.  Rule 142(a);

INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co.

v. Helvering, 292 U.S. 435, 440 (1934).  However, if taxpayers produce credible

evidence[23] with respect to any factual issue relevant to ascertaining the taxpayers'

---

[22]At trial Mr. Chodorow testified that at the time he had made his expert report he was not able to identify all of the fees associated with the CARDS transaction at issue.  After listening to Mr.  Hahn's testimony, Mr. Chodorow was able to quantify previously unknown fees.  Consequently, he concluded that the known fees for the CARDS transaction at issue totaled €444,403 or 51.1% as a percent of the amount petitioners received from Whitechapel in exchange for petitioners' assuming joint and several liability for the HVB loan.

[23]"Credible evidence is the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no

(continued...)

**[*16]** liability for any tax imposed by subtitle A or B of the Code and satisfy the requirements of section 7491(a)(2), the burden of proof on any such issue shifts to the Commissioner. Sec. 7491(a)(1). Section 7491(a)(2) requires taxpayers to demonstrate that they (1) complied with the requirements under the Code to substantiate any item, (2) maintained all records required under the Code, and (3) cooperated with reasonable requests by the Secretary[24] for witnesses, information, documents, meetings, and interviews. See Higbee v. Commissioner, 116 T.C. 438, 440-441 (2001).

Our resolution is based on a preponderance of the evidence, not on an allocation of the burden of proof. Therefore, we need not consider whether section 7491(a) would apply. See Estate of Bongard v. Commissioner, 124 T.C. 95, 111 (2005).

---

[23](...continued)
contrary evidence were submitted (without regard to the judicial presumption of IRS correctness)." Higbee v. Commissioner, 116 T.C. 438, 442 (2001) (quoting H.R. Conf. Rept. No. 105-599, at 240-241 (1998), 1998-3 C.B. 747, 994-995).

[24]The term "Secretary" means the Secretary of the Treasury or his delegate. Sec. 7701(a)(11)(B).

[*17] II.    Merits of CARDS Under the Economic Substance Doctrine

Taxpayers have the right to structure their transactions in a manner which decreases the amount of what otherwise would be their taxes. Gregory v. Helvering, 293 U.S. 465, 469 (1935). However, even if a transaction is in formal compliance with the Code, the economic substance of the transaction determines what is and what is not income to the taxpayers. Courts generally use a two-prong test to decide whether a transaction has economic substance. We are mindful, however, that there is a split among the Courts of Appeals as to the proper application of the economic substance doctrine. Absent a stipulation to the contrary, an appeal in this case would lie with the Court of Appeals for the Ninth Circuit. Sec. 7482(b)(1)(A). Accordingly, we follow the law of that circuit. See Golsen v. Commissioner, 54 T.C. 742 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971).

In determining whether a transaction has economic substance the Court of Appeals for the Ninth Circuit has stated that a taxpayer must show that the transaction had: (1) economic substance beyond the creation of tax benefits (objective analysis) and (2) a nontax business purpose (subjective analysis). See, e.g., Reddam v. Commissioner, 755 F.3d 1051, 1059-1061 (9th Cir. 2014), aff'g T.C. Memo. 2012-106; Bail Bonds by Marvin Nelson, Inc. v. Commissioner, 820

[*18] F.2d 1543, 1549 (9th Cir. 1987), aff'g T.C. Memo. 1986-23; see also

Casebeer v. Commissioner, 909 F.2d 1360, 1363 (9th Cir. 1990), aff'g T.C.

Memo. 1987-628; Sochin v. Commissioner, 843 F.2d 351, 354 (9th Cir. 1988),

aff'g Brown v. Commissioner, 85 T.C. 968 (1985). These distinct aspects of the

economic substance doctrine inquiry do not constitute discrete prongs of a rigid

two-step analysis but instead are related factors that inform the ultimate analysis of

whether the transaction has any practical economic effects beyond the creation of

tax benefits. Sochin v. Commissioner, 843 F.2d at 354. The ultimate

determination of whether a transaction lacks economic substance is a question of

fact. Id. at 353.

This Court has examined other CARDS transactions promoted by Chenery.

We have held that the CARDS transaction lacked economic substance on each

occasion. See Curtis Inv. Co., LLC v. Commissioner, T.C. Memo. 2017-150;

Hunter v. Commissioner, T.C. Memo. 2014-132; Kipnis v. Commissioner, T.C.

Memo. 2012-306; Crispin v. Commissioner, T.C. Memo. 2012-70; Kerman v.

Commissioner, T.C. Memo. 2011-54; Country Pine Fin., LLC v. Commissioner,

T.C. Memo. 2009-251; see also Putanec v. Commissioner, T.C. Memo. 2016-221

(addressing whether the liabilities assumed in a CARDS transaction affect basis).

The other CARDS transactions are essentially the same as the CARDS transaction

**[\*19]** in this case with only immaterial differences. Accordingly, we will look to the economic substance test as we have in past CARDS transaction cases.

### A. The Objective Analysis

The objective economic substance inquiry involves a broad examination of "whether the substance of a transaction reflects its form, and whether from an objective standpoint the transaction was likely to produce economic benefits aside from a tax deduction." Bail Bonds by Marvin Nelson, Inc. v. Commissioner, 820 F.2d at 1549. "A reasonable opportunity for profit will ordinarily be found only if there was a legitimate expectation that the nontax benefits would be at least commensurate with the associated transactions costs." Rovakat, LLC v. Commissioner, T.C. Memo. 2011-225, 2011 WL 4374589, at \*15, aff'd, 529 F. App'x 124 (3d Cir. 2013).

In regard to whether their CARDS transaction lacked economic substance, petitioners contend that the Court must consider its HVB hedge fund plan. In other words, petitioners contend that they entered into the CARDS transaction to obtain proceeds for investment and that the Court should consider their investment purpose and potential payout from that investment in determining whether the CARDS transaction objectively had economic substance. Other taxpayers have made similar arguments in CARDS transaction cases, and we have consistently

**[\*20]** rejected those arguments. See Kipnis v. Commissioner, at \*26-\*27; Country Pine Fin., LLC v. Commissioner, 2009 WL 3678793, at \*14. Although petitioners urge this Court to consider the profit potential from the investment(s) petitioners could have engaged in with proceeds from the CARDS transaction, we decline that invitation as we previously have and instead focus on the transaction "that gave rise to the tax loss". See Country Pine Fin., LLC v. Commissioner, 2009 WL 3678793, at \*14.[25] Because petitioners' HVB hedge fund plan is not the transaction that gave rise to the tax loss, we do not consider whether it had economic substance. We review the CARDS transaction separately from the potential transfers of proceeds that petitioners intended to use in their HVB hedge fund plan.

In reviewing the CARDS transaction without reference to the hypothetical transfer of the proceeds to petitioners, we find Mr. Chodorow's report and related testimony persuasive. Mr. Chodorow's report shows that the CARDS transaction

---

[25]We have consistently held that the relevant transaction to be tested is the one that produces the disputed tax benefit, even if it is part of a larger set of transactions or steps. Bank of New York Mellon Corp. v. Commissioner, 140 T.C. 15, 33-34 (2013), aff'd, 801 F.3d 104 (2d Cir. 2015); Kipnis v. Commissioner, T.C. Memo. 2012-306; Country Pine Fin., LLC v. Commissioner, T.C. Memo. 2009-251. The losses generated by the CARDS transaction at issue did not arise from petitioners' investing any HVB loan proceeds. The losses rather were the result of their acquisition and disposition of portions of the HVB loan proceeds, which did not create any nontax benefits, only artificial tax losses.

[*21] lacked profit potential. The report states that the CARDS transaction reduced petitioners' wealth by €156,068 and would have reduced it even more had the CARDS transaction lasted longer than one year. These losses would exist no matter what investments petitioners made with the proceeds because the same investments could have been financed by a more conventional type of loan, and the artificial, unrelated losses would remain even if we accepted petitioners' position that we should consider the potential transfer of proceeds to them as part of the CARDS transaction. See id.

Petitioners paid combined fees of €444,403 to participate in the CARDS transaction.[26] As Mr. Chodorow notes and we find persuasive, the financing costs were substantially above market rates for comparable financing options. As a result of the substantial financing costs, Mr. Chodorow concluded that "CARDS offered no possibility of a profit to Taxpayers."

On the record before us, we find that the CARDS transaction did not objectively provide petitioners with a reasonable possibility of profit.[27] On that

---

[26]This amount does not include the "Fee Built into Forward Contract" and "Negative Spread".

[27]Petitioners engaged in the CARDS transaction to create tax losses. They could have found less expensive financing but did not even investigate other options. Before entering into the CARDS transaction, they knew that it would

(continued...)

**[*22]** record, we find that petitioners fail to satisfy the objective test of the economic substance doctrine.

B.     Subjective Analysis

The subjective economic substance analysis involves considering the subjective factors that motivated the taxpayers to enter into the transaction at issue.  Bail Bonds by Marvin Nelson, Inc. v. Commissioner, 820 F.2d at 1549.

Petitioners contend they entered into the CARDS transaction to:  (1) make a profit from the fluctuations of the euro and the U.S. dollar; (2) have access to loan proceeds in the future to invest in potential investment opportunities; and (3) invest in distressed assets with HVB.  We find these claims disingenuous and wholly unconvincing.  There is substantial evidence that the decision to enter into the CARDS transaction at issue was solely tax motivated.

With respect to petitioners' first contention, we find incredible petitioners' claim that they intended to make a profit from currency fluctuations when they could not have made money on currency fluctuations as HVB required them to enter into a forward contract contemporaneously with the conversion of the euro.

---

[27](...continued)
generate a tax loss and this was their motive.  There was no genuine profit motive for the CARDS transaction, and any testimony to the contrary is simply not credible.

[*23] Contrary to their stated intent, petitioners exchanged the euro for dollars almost as soon as they were credited to them.

With respect to petitioners' second and third contentions, it was unreasonable for petitioners to believe that they could use the CARDS transaction as a borrowing facility to obtain capital for future investment opportunities (such as the HVB hedge fund) or for any business venture. Assuming petitioners actually intended to leverage funds for investment purposes, we believe they would have attempted to reduce their costs of borrowing and maximize the amount of funds available for investment. Instead, petitioners paid financing costs of approximately 51.1% of the €870,000 allegedly made available to them and organized their transaction such that it would result in a loss close to the amount of taxable gains from Chenery's income for tax year 2000. Further, petitioners did not seek or even investigate other financing options, yet they contend that the principal purpose of engaging in the CARDS transaction was to obtain funds to invest. Petitioners decided to enter into a CARDS transaction because borrowing money from other banks would not have provided them with the tax losses that the CARDS transaction promised.

Moreover, petitioners were aware at the time they entered into the CARDS transaction that HVB did not have a hedge fund or distressed assets available to

[*24] invest in.  In fact, Mr. Hahn testified that HVB did not have any distressed asset hedge funds in 2000 and 2001.  Even assuming arguendo that an HVB hedge fund existed at the time, as we noted above, Chenery still could not access the HVB loan proceeds without substituting collateral worth at least 102% of the proceeds.  That in and of itself was no guaranty as HVB had sole discretion to determine the type and amount of acceptable substitute collateral, if any.  If substitute collateral was accepted, HVB could discount it depending on its quality.  Further, the record does not reflect that Chenery ever requested to substitute collateral.

On the record before us, we do not find petitioners' claimed business purposes credible.  On that record, we find that petitioners fail to satisfy the subjective test of the economic substance doctrine.

C.    Conclusion

On the record before us, we find that petitioners' CARDS transaction did not have any practical economic effects beyond the creation of tax benefits and therefore lacks economic substance.  On that record, we further find that the loss deductions arising from the CARDS transaction are disallowed.

**[\*25]** We have considered all the other arguments made by the parties, and to the extent not discussed above, find those arguments to be irrelevant, moot, or without merit.[28]

To reflect the foregoing,

An appropriate order will be issued.

---

[28]The parties also asked the Court to decide: (1) whether petitioners pursued the CARDS transaction with an intent to make a profit; (2) whether petitioners' liabilities, in excess of the cash received from HVB, constituted genuine indebtedness; and (3) to what extent petitioners were at risk for the CARDS transaction at the close of the taxable year 2000. However, because we find that the CARDS transaction at issue lacked economic substance and the loss deductions are disallowed, we do not need to resolve these issues.